977 F.2d 1360
 36 Fed. R. Evid. Serv. 1165
 UNITED STATES of America, Plaintiff-Appellee,
v.
Clay Dalton JOHNSON, Jerry Duane Spears, Harold Onee
Behrens, also known as Buddy Behrens, and Edward
Dale Summerlin, also known as Peewee,
also known as Dwayne Wildman,
Defendants-Appellants.
 Nos. 91-7012, 91-7015 to 91-7017.
 United States Court of Appeals,
Tenth Circuit.
 Sept. 29, 1992.
 
 Mark Green, Muskogee, Okl., for defendant-appellant Edward Dale Summerlin.
 C. Rabon Martin, Law Offices of C. Rabon Martin, Tulsa, Okl., for defendants-appellants Jerry Duane Spears and Clay Dalton Johnson.
 Craig P. Bryant, Asst. Federal Public Defender, Tulsa, Okl., for defendant-appellant Harold Onee Behrens.
 Sheldon J. Sperling (John Raley, U.S. Atty., with him on the brief), Asst. U.S. Atty., Muskogee, Okl., for plaintiff-appellee.
 Before TACHA and KELLY, Circuit Judges, and CONWAY, District Judge.*
 TACHA, Circuit Judge.
 
 
 1
 This appeal arises from a joint trial of four defendants. The jury returned guilty verdicts against appellants Clay Dalton Johnson, Jerry Duane Spears, Harold Onee Behrens, and Edward Dale Summerlin for multiple counts related to the manufacturing, possession and distribution of drugs and possession of firearms.[1] We exercise jurisdiction under 28 U.S.C. § 1291 and affirm in part, reverse in part, and remand for resentencing.
 
 BACKGROUND
 
 2
 During the spring of 1990, Oklahoma State Game Ranger Dekota Cagle heard automatic weapon fire and smelled the odor of "amphetamine crank" near a cabin in the Kiamichi Mountain area of southeastern Oklahoma. Ranger D.G. Belcher testified that he also heard gunshots on several occasions while he was in the area. Between them, Rangers Cagle and Belcher testified that they had seen all of the appellants in the vicinity of the cabin. In April 1990, United States Forest Service Law Enforcement Officer Eugene Norvell was hunting in the area of the cabin and saw a man outside the cabin wearing a long, white laboratory coat. Officer Norvell returned to the area before daylight the next day and heard a generator running and smelled the chemical odor of phenylacetic acid, a precursor chemical to the manufacture of amphetamine. As a result, an investigation commenced, including hidden video-tape surveillance of the cabin area. The video-tape shows that Behrens, Johnson and Summerlin were near the cabin.
 
 
 3
 On July 27, 1990, Special Agent Dennis Bryant of the Drug Enforcement Administration (DEA), Agent Jeff Fulton of the Bureau of Alcohol, Tobacco and Firearms, and Deputy United States Marshal Thomas Hammon conducted further surveillance and took photographs in an area near the cabin. While these officers were in a wooded area north of the cabin, Spears--carrying an automatic Colt AR-15 rifle--approached Agent Bryant and Deputy Hammon. Spears said, "Hold it right there." Deputy Hammon responded, "No, you hold it right there and drop your weapon." Bryant then took the rifle from Spears. Bryant also confiscated a .9 mm Smith and Wesson pistol from Spears' belt. Spears then indicated that he was scared and said, "Don't kill me and don't shoot my kid." He also indicated that three men were inside the house.
 
 
 4
 The agents requested that Spears call for his son to come out of the house, and Spears complied. At that time, Agent Bryant "saw at least three men around the west end of the house taking up positions behind trees." He testified that "at least two of them had long guns." Speaking directly to Johnson, Agent Bryant shouted, "Clay, give it up. We're federal agents. You're under arrest." Bryant repeated the order, and Deputy Hammon called out the identity of each of the agents. At that time, Johnson left his position and ran around the west side of the house.
 
 
 5
 Agent Bryant moved to cut off an escape route and hid behind a tree about seventy yards from the cabin. He yelled that he was going to fire some signal shots in the air (to alert other agents in the area). He shouted, "I'm not shooting at anybody, don't be afraid. I'm just firing signal shots only." Agent Bryant then fired several signal shots. A few moments later, he yelled the same warning again and fired three more signal shots. At that time, Scott Spears--Jerry Spears' son--stepped away from the west side of the house with his hands in the air. He stated that "Buddy [Behrens], Clay [Johnson] and Peewee [Summerlin]" were inside the cabin.
 
 
 6
 Agent Bryant testified that, shortly thereafter, Summerlin stepped out of the east door of the cabin and fired a burst of automatic gunfire in his direction. Johnson also fired a burst of gunfire at Agent Bryant. Bryant testified that, from his experience, he believed Johnson's gun to be an AK-47 rifle. Agent Bryant returned fire and hit the house. Johnson ran into the woods, and Summerlin went back into the house. After some time, the agents performed a "security sweep" of the house, and they found it deserted.
 
 
 7
 After obtaining a search warrant from a federal magistrate, agents conducted a detailed search of the house. Among other things, they found numerous firearms, ammunition, explosives, amphetamine, precursor chemicals, laboratory equipment, marijuana plants, literature related to drug manufacturing, chemistry and assault weapons, and a list of chemical suppliers. By July 28, 1990, law enforcement officials had apprehended and arrested each of the defendants.
 
 
 8
 Represented by separate counsel, defendants appeared before a United States Magistrate on July 30, 1990. On August 2, 1990, the district court held a detention hearing. At the hearing, Agent Bryant and Firearms Special Agent Jeff Fulton reviewed their investigation of the cabin and the events that occurred on July 27 and 28, 1990. Defense counsel were afforded the opportunity to cross-examine these two agents. The district court held a preliminary hearing on August 7, 1990. Deputy United States Marshals Hammon and Jeff Jones testified about the investigation and the encounter with defendants. Defendants were allowed to cross-examine these two marshals. A federal grand jury indicted defendants on August 17, 1990, and the court arraigned them on August 29. On September 14, 1990, the district court held a suppression hearing, at which Agent Bryant and Marshals Hammon, Jones and Allbery testified and were subjected to cross-examination. Following a trial during mid-October, 1990, a jury returned guilty verdicts against appellants as listed above.
 
 DISCUSSION
 
 9
 I. District Court's Denial of Motion for a Continuance of the Suppression Hearing
 
 
 10
 On appeal, Johnson contends that his due process rights were violated because the district court's denial of his motion to continue the suppression hearing left Johnson with insufficient time to subpoena the agents he desired to question at the hearing. Johnson argues that had the district court granted his motion, he could have subpoenaed additional law enforcement officers and would have been able to show that the videotaped evidence and evidence obtained from a second search of the cabin should have been suppressed.
 
 
 11
 A district court's denial of "a motion for continuance can amount to error only if it constitutes an abuse of discretion." United States v. Rivera, 900 F.2d 1462, 1475 (10th Cir.1990) (en banc). Denial of a motion for a continuance constitutes "an abuse of discretion only if the denial was 'arbitrary or unreasonable and materially prejudiced the [defendant].' " Id. (quoting United States v. West, 828 F.2d 1468, 1469 (10th Cir.1987) (alteration added in Rivera ). In United States v. Harris, 441 F.2d 1333, 1336 (10th Cir.1971), we held that
 
 
 12
 [w]hen a continuance is sought to obtain witnesses, the accused must show who they [the witnesses] are, what their testimony will be, that the testimony will be competent and relevant, that the witnesses can probably be obtained if the continuance is granted, and that due diligence has been used to obtain their attendance on the day set for trial.
 
 
 13
 In addition, we consider that in this case, Johnson sought to delay the date of a suppression hearing, whereas the test set forth in Harris arose from the denial of a motion to delay the start of a trial. In United States v. Raddatz, 447 U.S. 667, 679, 100 S.Ct. 2406, 2414, 65 L.Ed.2d 424 (1980), the Supreme Court clearly indicated that "the process due at a suppression hearing may be less demanding and elaborate than the protections accorded the defendant at the trial itself." In light of these considerations and our review of the record, we reject Johnson's due process claim.
 
 
 14
 First, although Johnson was aware of the names and positions of many of the officers he assertedly would have subpoenaed had the district court granted his motion for continuance, he failed to produce any specific information about the testimony the officers would have provided. Additionally, Johnson was less than diligent in attempting to subpoena law enforcement officials before the suppression hearing. The record indicates that although Johnson had more than a month after the preliminary hearing to prepare for the suppression hearing, neither he nor his counsel made any diligent attempt to serve subpoenas on any of the law enforcement officers they claim could have helped them suppress evidence. Johnson failed to comply with the standard set forth in Harris. We conclude, therefore, that the district court did not abuse its discretion when it denied Johnson's motion for a continuance.[2]
 
 
 15
 II. Admission of Two Containers of Amphetamine
 
 
 16
 Johnson also contends that the district court erred by admitting into evidence two thermos bottles containing amphetamine and a prescription bottle filled with white powder. He asserts that the government failed to establish an adequate chain of custody and failed to properly identify these items before they were admitted into evidence. We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. United States v. Cardenas, 864 F.2d 1528, 1530 (10th Cir.), cert. denied, 491 U.S. 909, 109 S.Ct. 3197, 105 L.Ed.2d 705 (1989). "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a).
 
 
 17
 When "evidence is unique, readily identifiable and relatively resistant to change, the foundation need only consist of testimony that the evidence is what its proponent claims." Cardenas, 864 F.2d at 1531. On the other hand, when the evidence "is not readily identifiable and is susceptible to alteration by tampering or contamination, the trial court requires a more stringent foundation 'entailing a "chain of custody" of the item with sufficient completeness to render it improbable that the original item has either been exchanged with another or been contaminated or tampered with.' " Id. (quoting Edward W. Cleary, McCormick on Evidence § 212, at 667 (3d ed. 1984)) (emphasis added in Cardenas ).
 
 
 18
 However, "the chain of custody need not be perfect for the evidence to be admissible." Id. If the trial court--after "consider[ing] the nature of the evidence, and the surrounding circumstances, including presentation, custody and probability of tampering or alteration"--"determines that the evidence is substantially in the same condition as when the crime was committed, the court may admit it." Id. Once the court properly decides that the evidence is admissible, "deficiencies in the chain of custody go to the weight of the evidence, not its admissibility; the jury evaluates the defects and, based on its evaluation, may accept or disregard the evidence." United States v. Brandon, 847 F.2d 625, 630 (10th Cir.), cert. denied, 488 U.S. 973, 109 S.Ct. 510, 102 L.Ed.2d 545 (1988).
 
 
 19
 At trial, FBI agent Jim Elliott testified regarding his participation in the search of several vehicles. He stated that he searched a GMC pickup truck--identified as Johnson's truck--and found two thermos bottles in the front seat that emitted an odor that he associated with "methamphetamine." He also found a prescription bottle in the truck that contained a white substance. He testified that the bottles were "turned over to the Oklahoma State Bureau of Investigation [OSBI] chemists at the scene." During the first day of his testimony, Elliott answered affirmatively when the prosecutor asked whether he had given the prescription bottle to another agent for the purpose of relaying them to a chemist for analysis. The next day, Elliott stated that he gave the thermos bottles "to the OSBI chemist." Defense counsel did not cross-examine Elliott with respect to whom Elliott gave the thermos bottles and the prescription bottle.
 
 
 20
 OSBI chemist Richard Dill later took the stand. He carried several sacks, two of which contained the thermos bottles and one of which contained the prescription bottle. He testified that these items were brought to him at the cabin lab site and that he then carried them from the cabin to the OSBI laboratory. He also testified that he could not recall who had given him the exhibits. Dill indicated that, except for entry into the bottles for testing, the exhibits were in the same sealed condition as when he received them at the lab site. Counsel for Johnson objected to the admission of the thermos bottles. The district court overruled the objection and admitted the exhibits into evidence. On appeal, Johnson contends that the district court abused its discretion by admitting the thermos bottles and the prescription bottle. He specifically points to inconsistencies in Agent Elliott's testimony regarding whether he gave the bottles to another agent or gave them directly to an OSBI chemist.
 
 
 21
 Although the chain of custody for the bottles may not be perfect, we conclude that the district court did not abuse its discretion in admitting this evidence. Johnson introduced no evidence that the bottles had been tampered with or altered in any way. Agent Elliott testified that he found two thermos bottles and a prescription bottle in the truck and that he either gave them to an OSBI chemist or to another agent who relayed them to a chemist. Defense counsel failed to cross-examine Elliott on this issue to determine whether this slight inconsistency was inadvertent or the result of a deliberate alteration. An OSBI chemist testified that he received the bottles at the lab site, that they remained in the same condition thereafter, and that they tested positive for amphetamine. In addition, another witness, Joe Pierce, testified that he had seen large thermos containers filled with "crank" (amphetamine) at Johnson's house. This evidence was sufficient to warrant the district court's admission of the bottles.
 
 
 22
 In Cardenas, we held that "[t]he trial court need not rule out every possibility that the evidence underwent alteration; it need only find that the reasonable probability is that the evidence has not been altered in any material respect." 864 F.2d at 1532. We have also held that " '[a]bsent some showing by the defendant that the exhibits have been tampered with, it will not be presumed that the investigators who had custody of them would do so.' " United States v. Lepanto, 817 F.2d 1463, 1465 (10th Cir.1987). Because Johnson proffered no evidence of tampering, we hold that the district court did not abuse its discretion in admitting the bottles into evidence and that any imperfections in the chain of custody were to be weighed by the jury. See United States v. Mora, 845 F.2d 233, 236-37 (10th Cir.) (where evidence indicated that a plastic bag full of cocaine had been moved, but not that it had been tampered with, district court did not abuse its discretion by admitting the cocaine), cert. denied, 488 U.S. 995, 109 S.Ct. 562, 102 L.Ed.2d 587 (1988).
 
 III. Possession of Unregistered Machine Gun
 
 23
 Each of the defendants was convicted of possessing an unregistered machine gun in violation of 26 U.S.C. § 5861(d) and 18 U.S.C. § 2 (Count 13). We vacate those convictions.
 
 
 24
 In United States v. Dalton, 960 F.2d 121 (10th Cir.1992), we recently addressed a challenge to a conviction under 26 U.S.C. § 5861(d). We vacated the defendant's conviction on due process grounds because Congress' enactment of 18 U.S.C. § 922(o)[3] in 1986--which prohibits the possession of any machine gun transferred after 1986--made it impossible to register a machine gun and thus comply with 26 U.S.C. § 5861(d). We reasoned that
 
 
 25
 because the registration requirements of the National Firearms Act were passed pursuant to the taxing power and because after the enactment of section 922(o) the government will no longer register or tax machineguns, section 922(o) has "removed the constitutional legitimacy of registration as an aid to taxation." "Thus, § 922(o) undercut the constitutional basis of registration which had been the rule since Sonzinsky [v. United States, 300 U.S. 506, 57 S.Ct. 554, 81 L.Ed. 772 (1937) ]."
 
 
 26
 Id. at 124-25 (quoting United States v. Rock Island Armory, 773 F.Supp. 117, 125 (C.D.Ill.1991)) (citations omitted). For the same reasons, we vacate appellants' convictions on Count 13.
 
 IV. Sufficiency of the Evidence
 
 27
 " 'Evidence is considered sufficient to support a criminal conviction if, when viewed in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt.' " United States v. Ratchford, 942 F.2d 702, 703 (10th Cir.1991) (quoting United States v. Culpepper, 834 F.2d 879, 881 (10th Cir.1987)), cert. denied, --- U.S. ----, 112 S.Ct. 1185, 117 L.Ed.2d 427 (1992).
 
 A. Counts 11 and 15
 
 28
 Behrens contends that evidence was insufficient to support his convictions on Counts 11 and 15. Johnson and Spears generally contend that the evidence was insufficient as to numerous counts on which they were convicted, including Counts 11 and 15. Count 11 charged that appellants "used or carried certain firearms (machine guns) to include an Ingram MAC-10 .45 caliber machine gun, during and in relation to the commission of drug trafficking felonies," in violation of 18 U.S.C. § 924(c) and 18 U.S.C. § 2. Count 15 charged that appellants used or carried firearms during and in relation to a conspiracy to manufacture amphetamine "and/or an attempt to manufacture amphetamine and/or marijuana" in violation of 18 U.S.C. § 924(c)(1) and 18 U.S.C. § 2. Count 15 specifically mentioned a .22 caliber rifle, a .44 magnum revolver, a .380 caliber pistol, a 30/30 rifle, a 16-gauge shotgun, and a 20-gauge shotgun. Behrens specifically argues that there is insufficient evidence that he "used" the firearms in question.
 
 
 29
 In United States v. McKinnell, 888 F.2d 669 (10th Cir.1989), we held that a firearm is "used" for the purposes of § 924(c) "when the defendant has 'ready access' to the firearm and the firearm 'was an integral part of his criminal undertaking and its availability increased the likelihood that the criminal undertaking would succeed.' " Id. at 675 (quoting United States v. Matra, 841 F.2d 837, 843 (8th Cir.1988)). We also agreed with other circuits that " 'a defendant can "use" a firearm within the meaning of § 924(c)(1) without firing, brandishing, or displaying it.' " Id. at 674-75 (quoting United States v. Meggett, 875 F.2d 24, 29 (2d Cir.), cert. denied, 493 U.S. 858, 110 S.Ct. 166, 107 L.Ed.2d 123 (1989)). In McKinnell, we held that "the jury could reasonably have concluded that the firearm, located within easy reach of the defendant [under a bag in the passenger compartment of the defendant's car], was readily accessible to him and formed an integral part of his criminal undertaking by providing a means of protecting his operation and intimidating those encountered in the course of drug transactions." Id. at 675.
 
 
 30
 At trial, the government presented ample evidence that numerous firearms--including machine guns, rifles, pistols and shotguns--had been in the house and were in the house at the time of the altercation on July 27, 1990. When they searched the house, the federal agents confiscated many of these firearms and related ammunition. The government also presented evidence that tied Johnson, Spears and Behrens to the use of these firearms at or near the cabin/laboratory site and that suggested the firearms were readily accessible to each of them.[4] Agent Bryant and Marshal Hammon gave testimony suggesting that Spears was patrolling the area around the cabin. Bryant testified that when Spears saw him, Spears approached and said, "Hold it right there." The government also introduced much evidence related to the existence and manufacture of amphetamine at the cabin, including precursor chemicals and necessary lab supplies. We conclude that the evidence clearly was sufficient such that a reasonable jury could find Johnson, Spears and Behrens guilty beyond a reasonable doubt on Counts 11 and 15. See United States v. Sullivan, 919 F.2d 1403, 1431-32 (10th Cir.1990) (evidence sufficient under § 924(c) where there was evidence of multiple weapons at the defendants' residences, that the male defendants commonly carried firearms, that three of the defendants possessed weapons at the laboratory site, and that "two defendants took weapons to investigate possible trouble with the 'feds' ").
 
 B. Other Counts
 
 31
 Johnson and Spears generally assert that the evidence was insufficient to support convictions for conspiracy to manufacture amphetamine (Count 1--21 U.S.C. § 846), for conspiracy to commit offenses against the United States (Count 2--18 U.S.C. § 371), and for maintaining a place for the purpose of manufacturing, storing, distributing, or using amphetamine (Count 6--21 U.S.C. § 856(a)(1)). Johnson and Spears contend that although the evidence presented at trial "may" suggest that they were guilty on these counts, there was "no direct evidence" as to some of the required elements under these statutes. For instance, both argue that there is no direct evidence that they conspired to manufacture amphetamine or that they attempted to manufacture amphetamine.
 
 
 32
 We have held that even when direct evidence is lacking, a "criminal conviction may be sustained on wholly circumstantial evidence." United States v. Hooks, 780 F.2d 1526, 1531 (10th Cir.), cert. denied, 475 U.S. 1128, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986). The evidence and inferences drawn therefrom must be viewed in the aggregate rather than in isolation. Id. at 1532. As long as the inferences drawn are reasonable, it is the jury's role--not ours--to determine what "may" have occurred. Having reviewed the record in accordance with the appropriate standard of review, we conclude that evidence--both direct and circumstantial--is sufficient to sustain Johnson's and Spears' convictions on Counts 1, 4, 5, and 6.[5]V. Double Jeopardy Challenges
 
 
 33
 Johnson and Spears also generally contend that they have been convicted of multiple offenses arising out of a single course of conduct in violation of rights guaranteed by the Double Jeopardy Clause. Appellants contend that, under the Supreme Court's recent case of Grady v. Corbin, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), an individual may be convicted only for a single offense arising from the same course of conduct. We disagree.
 
 
 34
 In Grady, the Supreme Court set forth the test for determining whether a subsequent prosecution violates the Double Jeopardy Clause. Here, on the other hand, we address a different question: whether the Double Jeopardy Clause limits multiple convictions in a single prosecution arising from the same criminal episode or same operative facts. In United States v. Morehead, 959 F.2d 1489 (10th Cir.1992), we stated that "[w]here multiple counts for which a defendant is convicted cover the same criminal behavior, our review is limited to whether Congress intended multiple convictions under the statutes." Id. at 1506 (citing Garrett v. United States, 471 U.S. 773, 779, 105 S.Ct. 2407, 2411, 85 L.Ed.2d 764 (1985), and Missouri v. Hunter, 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983)). If Congress intended multiple convictions based on the same course of conduct, no concerns related to the Double Jeopardy Clause are implicated. See Hunter, 459 U.S. at 366, 103 S.Ct. at 678 ("With respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended."). Therefore, we look to Congressional intent to determine whether appellants were convicted of multiple offenses in violation of the Double Jeopardy Clause.[6]
 
 A. Conspiracy to Commit Drug Crimes
 
 35
 In United States v. Abreu, 962 F.2d 1425 (10th Cir.), on reh'g, 962 F.2d 1447 (10th Cir.1992), we explained that "[t]he law is well settled that commission of a substantive offense and a conspiracy to commit it are separate crimes" because "[t]he essence of a conspiracy charge is an agreement to commit" a substantive offense. Id. at 1434 (quoting United States v. Jackson, 482 F.2d 1167, 1176 (10th Cir.1973), cert. denied, 414 U.S. 1159, 94 S.Ct. 918, 39 L.Ed.2d 111 (1974)). Therefore, we agreed with other circuits that have held that Congress intended to allow imposition of separate sentences for a conspiracy conviction under 21 U.S.C. § 846 and for the substantive drug offenses that form the object of the conspiracy. See, e.g., United States v. Goff, 847 F.2d 149 (5th Cir.), cert. denied, 488 U.S. 932, 109 S.Ct. 324, 102 L.Ed.2d 341 (1988); United States v. Wylie, 625 F.2d 1371 (9th Cir.1980), cert. denied, 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981); see also United States v. Espinosa, 771 F.2d 1382, 1402-03 n. 27 (10th Cir.) ("[t]he district judge here could have sentenced defendants to consecutive sentences [under § 841 and § 846]"), cert. denied, 474 U.S. 1023, 106 S.Ct. 579, 88 L.Ed.2d 561 (1985).
 
 
 36
 In this case, Count 1 charged Johnson and Spears with conspiracy to commit various drug-related crimes in violation of 21 U.S.C. § 846, and the jury returned a guilty verdict on that count.[7] Johnson was charged in separate counts and convicted for committing each of the substantive offenses that were the objects of the conspiracy count. Spears was separately charged and convicted of one of those substantive offenses. Abreu controls our decision here, and we conclude that appellants' separate convictions for conspiracy under § 846 and for the drug offenses that formed the object of that conspiracy do not violate rights guaranteed by the Double Jeopardy Clause.
 
 B. Substantive Drug Offenses
 
 37
 We next examine whether appellants' convictions on multiple substantive drug offenses are contrary to Congress' intent. Each of the appellants was charged (Count 6) and convicted for "maintain[ing] a place for the purpose of manufacturing, storing, distributing, or using a controlled substance, namely amphetamine," in violation of 21 U.S.C. § 856(a)(1). Johnson and Behrens were also charged (Count 8) and convicted for violation of 18 U.S.C. § 856(a)(2), which provides that
 
 
 38
 it shall be unlawful to ... manage or control any building, room, or enclosure, either as an owner, lessee, agent, employee, or mortgagee, and knowingly and intentionally rent, lease, or make available for use, with or without compensation, the building, room, or enclosure for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance.
 
 
 39
 In Morehead, two defendants were convicted of violating both § 856(a)(1) and § 856(a)(2) after law enforcement officers inadvertently discovered marijuana plants at their residence. The defendants challenged their convictions on double jeopardy grounds. Applying the " 'well-settled rule of statutory construction' " set forth in Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932),[8] for determining " 'whether Congress has in a given situation provided that two statutory offenses may be punished cumulatively,' " we held that, absent "any clear statement of legislative intent to the contrary, ... subsections (a)(1) and (a)(2) are the same offense." Morehead, 959 F.2d at 1506 (quoting Whalen v. United States, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980)). We reasoned that the count "charging the violation of subsection (a)(1) is the lesser included offense of [the count charging a subsection (a)(2) violation] because 'it requires no proof beyond that which is required for conviction of the greater.' " Id. at 1507 (quoting Brown v. Ohio, 432 U.S. 161, 168, 97 S.Ct. 2221, 2227, 53 L.Ed.2d 187 (1977)).
 
 
 40
 Although the conviction on the lesser included offense generally is vacated when a defendant is convicted under multiplicitous counts, United States v. Stallings, 810 F.2d 973, 976 (10th Cir.1987), in Morehead we vacated the count charging a violation of § 856(a)(2) because "the conduct charged fit[ ] more squarely" into that count. Morehead, 959 F.2d at 1507. In Morehead, the defendants were lessees of the property on which the marijuana plants were found. Analyzing the plain language of § 856(a), we stated that subsection (a)(2)
 
 
 41
 was designed to punish a person who permits property which they manage and control to be used by a third person for the activity relating to narcotics. Essentially, subsection (a)(2) seeks to punish the lessor, not the lessee. Whereas, the language of subsection (a)(1) indicates that it was designed to punish a person who uses his own property for the activity relating to narcotics. The government's suggestion that (a)(2) can be used to punish the lessee is a misapplication of the statute to the facts of this case and would render superfluous the language "with or without compensation."
 
 
 42
 Id. (citations omitted). Therefore, we vacated the convictions on the count charging a violation of § 856(a)(2).
 
 
 43
 In the present case, we are faced with a similar situation with respect to Behrens. Behrens was convicted on separate counts of violating both subsections (a)(1) and (a)(2) in relation to the same place where appellants attempted to manufacture amphetamine. Because subsection (a)(1) is a lesser included offense of subsection (a)(2), convictions under both subsections violate double jeopardy principles, and one of the counts must be vacated. The record indicates that Behrens' conduct fits more squarely into the activities prohibited by subsection (a)(1) than those prohibited by subsection (a)(2): he owned neither the cabin nor surrounding property, but helped to maintain an amphetamine laboratory on the premises. Therefore, we follow the reasoning of Morehead and vacate Behrens'[9] conviction on Count 8, which charged a violation of § 856(a)(2). Because the record suggests that Johnson purchased the cabin property and worked with third persons in attempting to manufacture amphetamine there, his actions fit squarely into the conduct prohibited by § 856(a)(2). Therefore, we vacate his conviction under Count 6, which charges the lesser included offense of violating § 856(a)(1).
 
 
 44
 We next note that Johnson was convicted of both possessing amphetamine in violation of 21 U.S.C. § 844(a) (Count 3) and possessing with the intent to distribute amphetamine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count 5). It is well-established that, as to a single cache of drugs, simple possession under § 844(a) is a lesser included offense of possession with intent to distribute under § 841(a)(1). See Brown v. Ohio, 432 U.S. 161, 169, 97 S.Ct. 2221, 2227, 53 L.Ed.2d 187 (1977) ("Fifth Amendment forbids ... cumulative punishment for greater and lesser included offenses."); United States v. Burns, 624 F.2d 95 (10th Cir.) ("[p]ossession of a controlled substance, relative to the crime of possession with intent to distribute, is a prototypal 'lesser included offense' "), cert. denied, 449 U.S. 954, 101 S.Ct. 361, 66 L.Ed.2d 219 (1980).
 
 
 45
 We are presented here with a different situation, however, because Johnson's convictions were based on allegedly distinct quantities of amphetamine. The allegation of simple possession in Count 3 was limited to Johnson alone and was limited by its language to the brown vial found in Johnson's truck. Count 5, on the other hand, applies to all of the appellants, alleges possession with intent to distribute amphetamine, and was limited by its language to the "two thermos bottles and other containers located in a pickup to which a trailer was attached." We assume that Johnson challenges the government's decision to prosecute the possession of the brown vial separately from the possession of the rest of the narcotics. Essentially, Johnson argues that all of the amphetamine was part of the same criminal episode or transaction for purposes of double jeopardy.
 
 
 46
 After reviewing the record, we are unable to find support for that assertion. "To support a claim for double jeopardy, a defendant must show that the two offenses charged are in law and in fact the same offense." United States v. Marable, 578 F.2d 151, 153 (5th Cir.1978). Johnson fails to meet this burden because the evidence amply demonstrates that the brown vial amphetamine was not in fact the same as the rest of the amphetamine.
 
 
 47
 In drug cases, the question frequently arises whether a defendant's entire cache of drugs is to be considered as a single unit or as separate units for purposes of defining the extent of his criminal activity. Although a supply of narcotics generally is not divisible for purposes of prosecution, various stashes of that drug are considered separate where the evidence indicates that they were intended for different purposes or transactions. See United States v. Maldonado, 849 F.2d 522, 524 (11th Cir.1988) (two convictions of possession with intent to distribute where one stash found on defendant en route to sale and separate stash found in subsequent search of defendant's home); United States v. Blakeney, 753 F.2d 152, 154-55 (D.C.Cir.1985) (two convictions of possession with intent to distribute where separate stashes kept in apartment and at place of employment). Moreover, a determination of the existence of separate stashes is not constrained by any particular measure of spatial or temporal distance. See United States v. Palacios, 835 F.2d 230, 233-34 (9th Cir.1987).[10] The proper focus of a "separate stash" inquiry is not on logistics but on demonstrated intent.
 
 
 48
 That the brown vial amphetamine constituted a personal stash separate from the narcotics intended for sale is beyond dispute. At trial, Johnson admitted to possession of the brown vial amphetamine for personal use. Indeed, Johnson's defense to the § 841(a)(1) distribution charge was that all of the drugs were for personal consumption. The jury, however, made the permissible inference--based on the quantity of amphetamine seized, the potential output of the manufacturing operations, and the physical packaging of the amphetamine--that the larger quantities of amphetamine contained in the thermos bottles were not for Johnson's personal use but rather were intended for distribution. Hooks, 780 F.2d at 1532; see also United States v. Faymore, 736 F.2d 328, 333 (6th Cir.) ("intent to distribute can be inferred by the jury from circumstantial evidence of possession of large quantities"), cert. denied, 469 U.S. 868, 105 S.Ct. 213, 83 L.Ed.2d 143 (1984). In this case, where a small, personal-sized container is found along with larger, commercial-sized containers, and where the defendant admits that he intended the smaller quantity for personal use only, the jury could reasonably conclude that two separate stashes existed. Therefore, each constituted a distinct criminal transaction. We cannot merge separate and distinct criminal acts simply because the defendant was unwise or unlucky enough to have been both a dealer and a user. Because Johnson has failed to establish the threshold commonality in law and in fact of the events underlying the two convictions, we do not reach the issue of multiplicitous statutes raised in Morehead and Abreu.[11]
 
 
 49
 We next turn to the convictions of Johnson, Behrens and Summerlin both for attempting to manufacture amphetamine in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2 and for maintaining a place for the purpose of manufacturing, storing, distributing, or using a controlled substance in violation of 21 U.S.C. § 856(a)(1). In United States v. Sturmoski, 971 F.2d 452 (10th Cir.1992), we recently held that § 856(a)(1) and an attempt under § 846 are separate offenses for double jeopardy purposes. We looked to the plain language and legislative history of § 856(a)(1) and found that "Congress intended multiple convictions and punishments" for violations of § 856(a)(1) and § 846. Id. at 461. We reasoned that[t]he plain language of [§ 856(a)(1) ] evidences a clear congressional intent to punish a defendant who maintains property for the purpose of manufacturing controlled substances. This section goes far beyond the proscriptions found in other statutes relating to possession and manufacture of controlled substances and actually criminalizes a particular defendant's use of property....
 
 
 50
 The legislative history of § 856 reinforces this plain language analysis ... [and] demonstrates that, by enacting § 856, Congress unequivocally determined to create a distinct offense--with its own, separate punishment--aimed specifically at criminalizing the use of property for narcotics-related purposes.
 
 
 51
 Id. Therefore, appellants' multiple convictions in Count 6 (§ 856(a)(1)) and Count 4 (§ 846) do not violate the Double Jeopardy Clause. Our analysis in Sturmoski of the legislative history of § 856 applies equally to subsection (a)(2). See id. (quoting numerous excerpts from the Congressional record stating that § 856 is a "new" offense). Therefore, we also hold that Johnson's separate convictions under § 856(a)(2) and for an attempt under § 846 do not violate the Double Jeopardy Clause.
 
 
 52
 We have reviewed the remaining counts on which appellants were charged and convicted for substantive drug offenses and hold that multiple convictions on those counts do not violate the Double Jeopardy Clause. After vacating Johnson's convictions on Counts 3 and 6 and Behrens' conviction on Count 8, the remaining substantive drug offense counts are Count 4, charging an attempt to manufacture amphetamine in violation of § 846 and 18 U.S.C. § 2, and Count 5, charging possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The plain language of these statutory provisions clearly evidences congressional intent that convictions and punishments separate from the other drug offenses charged be imposed for violations of each.
 
 
 53
 Finally, we note that Spears was separately convicted for violations of both 18 U.S.C. § 924(c) and 18 U.S.C. § 922(g), which prohibits possession of a firearm, "in or affecting commerce," after being convicted "of a crime punishable by imprisonment for a term exceeding one year." We join with other circuits in concluding that separate convictions under § 924(c) and under § 922(g) do not violate the Double Jeopardy Clause. United States v. Lawrence, 928 F.2d 36 (2d Cir.1991); United States v. McKinney, 919 F.2d 405, 416-17 (7th Cir.1990); United States v. Hunter, 887 F.2d 1001, 1003 (9th Cir.1989), cert. denied, 493 U.S. 1090, 110 S.Ct. 1159, 107 L.Ed.2d 1062 (1990). In McKinney, the Seventh Circuit stated that
 
 
 54
 "[i]t is obvious that conviction of the offense under Section 924(c)(1) requires proof of elements not required for conviction under 922(g)(1), and vice versa." Section [922(g)(1) ] is a penalty for a felon who possesses a firearm, while section [924(c)(1) ] addresses Congress' concern with the more heinous crime of drug trafficking with a firearm. Therefore, the two charges satisfy the Blockburger test.
 
 
 55
 McKinney, 919 F.2d at 417 (quoting Hunter, 887 F.2d at 1003) (footnote omitted). We agree.
 
 
 56
 C. Conspiracy to Violate 18 U.S.C. § 924(c)
 
 
 57
 All four appellants were charged in Count 2 and convicted of a conspiracy under 18 U.S.C. § 371 to violate 18 U.S.C. § 924(c), which prohibits using or carrying firearms during or in relation to a drug-trafficking crime. In United States v. Hill, 971 F.2d 1461 (10th Cir.1992) (en banc), we recently held that § 924(c) constitutes an "offense against the United States" and therefore may be charged as the unlawful objective of a § 371 conspiracy.[12] We also note that because " '[t]he essence of a conspiracy charge [under § 371] is an agreement to commit an offense against the United States,' " Abreu, 962 F.2d at 1434 (quoting Jackson, 482 F.2d at 1176), multiple convictions for a conspiracy under § 371 and for the substantive offense under § 924(c) do not violate Double Jeopardy Clause rights. Id. ("The law is well settled that commission of a substantive offense and a conspiracy to commit it are separate crimes."). Therefore, we next determine whether appellants' convictions for two different conspiracies--an 18 U.S.C. § 371 conspiracy to violate 18 U.S.C. § 924(c) (Count 2) and a 21 U.S.C. § 846 conspiracy to violate various drug-trafficking offenses (Count 1)--violate the Double Jeopardy Clause.
 
 
 58
 In Morehead, we held that separate convictions for an 18 U.S.C. § 371 conspiracy to violate 18 U.S.C. § 924(c) and for a conspiracy under 21 U.S.C. § 846 to violate drug-trafficking offenses do not violate rights guaranteed by the Double Jeopardy Clause. Morehead, 959 F.2d at 1508-09; accord Timberlake v. United States, 767 F.2d 1479 (10th Cir.1985) (separate convictions for a conspiracy under 21 U.S.C. § 846 and for a conspiracy under 18 U.S.C. § 371 do not violate the Double Jeopardy Clause), cert. denied, 474 U.S. 1101, 106 S.Ct. 882, 88 L.Ed.2d 918 (1986); United States v. Raymer, 941 F.2d 1031, 1043-44 (10th Cir.1991) (defendant may be cumulatively punished under both 21 U.S.C. § 846 and 18 U.S.C. § 371 even though objects of the conspiracy overlapped); see also United States v. Lanier, 920 F.2d 887, 891-95 (11th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 208, 116 L.Ed.2d 166 (1991); United States v. Cuevas, 847 F.2d 1417, 1429-30 (9th Cir.1988), cert. denied, 489 U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989); United States v. Nakashian, 820 F.2d 549, 552-54 (2d Cir.), cert. denied, 484 U.S. 963, 108 S.Ct. 451, 98 L.Ed.2d 392 (1987). After we determined that both the statutory language and the legislative history are silent as to Congress' intent regarding multiple conspiracy convictions, we applied the Blockburger test and affirmed the convictions on separate conspiracies because a conviction under each conspiracy statute "requires proof of a fact which the other does not." Blockburger, 284 U.S. at 304, 52 S.Ct. at 182.
 
 
 59
 In this case, as in Morehead, the object of the § 371 conspiracy charged in Count 2 is the violation of 18 U.S.C. § 924(c), which prohibits the use of firearms during or in relation to a drug-trafficking offense. Some of the same drug-trafficking offenses that underlie the § 924(c) violation--which is the unlawful object of the § 371 conspiracy in Count 2--are also charged as the object of the § 846 conspiracy in Count 1. However, we have held that "[t]he most basic element of a drug trafficking conspiracy is an agreement between two or more persons to violate federal narcotics laws." United States v. Savaiano, 843 F.2d 1280, 1294 (10th Cir.1988) (emphasis added). Although a conviction on Count 2 for a conspiracy to violate § 924(c) requires proof of an agreement to use or carry firearms during or in relation to a drug-trafficking crime, a conviction on that count does not require proof of an agreement to violate federal drug-trafficking laws. Morehead, 959 F.2d at 1508-09. Therefore, a conviction on Count 1 required proof of a fact not required for a conviction on Count 2.
 
 
 60
 D. Separate convictions under 18 U.S.C. § 924(c)
 
 
 61
 We now turn to the fact that appellants were convicted of violating 18 U.S.C. § 924(c) on three separate counts. Counts 11 and 15 charge all four appellants with § 924(c) violations. Count 11 alleges that appellants used or carried a machine gun; Count 15 alleges that appellants used or carried multiple other firearms. Count 12 charges only Spears with a § 924(c) violation and lists only the two guns he carried when he encountered law enforcement officials while patrolling the cabin area. Counts 11 and 12 listed the same three drug-trafficking offenses to support the § 924(c) violations: conspiracy to manufacture amphetamine (21 U.S.C. § 846); attempt to manufacture amphetamine (21 U.S.C. § 846); and possession with intent to distribute amphetamine (21 U.S.C. § 841(a)(1)). Count 15 listed only conspiracy to manufacture amphetamine and attempt to manufacture amphetamine as underlying offenses.
 
 
 62
 In Sturmoski, we stated that "consecutive sentences may be imposed for multiple 924(c) counts if the offenses underlying each 924(c) count do not constitute a single offense for double jeopardy purposes ... even though the underlying offenses arise out of the same criminal episode." Sturmoski, 971 F.2d at 461 (citing Abreu, 962 F.2d at 1432-33); United States v. Chalan, 812 F.2d 1302, 1315-17 (10th Cir.1987), cert. denied, 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 565 (1988)). We also have held that where a single drug-trafficking offense underlies a § 924(c) violation, multiple sentences "may not be stacked to account for each firearm seized." United States v. Henning, 906 F.2d 1392, 1399 (10th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 789, 112 L.Ed.2d 852 (1991); see also United States v. Rogers, 921 F.2d 1089, 1092-93 (10th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 2812, 115 L.Ed.2d 985 (1991); United States v. Ross, 920 F.2d 1530, 1538-39 (10th Cir.1990).
 
 
 63
 In the present case, the government has charged three separate § 924(c) violations with different guns listed in each count. Although the law of our circuit clearly prohibits three separate § 924(c) convictions based on the same underlying drug offense, we have not directly addressed whether multiple sentences may be based on separate counts that list several of the same or overlapping drug offenses as bases for the § 924(c) violations. In Henning, although we addressed multiple § 924(c) counts in relation to a single underlying drug offense conviction, we relied on United States v. Henry, 878 F.2d 937 (6th Cir.1989), to support our decision. In Henry, the Sixth Circuit held that where the government referenced the same two drug offenses in each of two § 924(c) counts, two separate firearms convictions violated the Double Jeopardy Clause. Id. at 943. Two other circuits have agreed with the reasoning in Henry. In United States v. Privette, 947 F.2d 1259 (5th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1279, 117 L.Ed.2d 505 (1992), the Fifth Circuit stated that
 
 
 64
 to avoid violating double jeopardy principles each firearms offense must be sufficiently linked to a separate drug trafficking offense to prevent two convictions under § 924(c) on the same drug offense....
 
 
 65
 We cannot determine whether the jury based both convictions on the use of firearms in the conspiracy. If the jury convicted Privette twice for using firearms during the conspiracy, Privette would be doubly punished for the same crime....
 
 
 66
 The necessary linkage between a firearms charge and a drug trafficking offense is best accomplished by clearly identifying in the indictment the drug offense supporting each firearms count.
 
 
 67
 Id. at 1262-63; see also United States v. Smith, 924 F.2d 889, 894 (9th Cir.1991) (defendant can be convicted on only one count where, "although two different guns were the basis for the two section 924(c)(1) counts, both counts were based on the same two predicate offenses"). Because we are unable to determine whether the jury linked each alleged § 924(c) violation to a separate underlying drug offense, we vacate the sentences imposed on Counts 12 and 15, and we remand to the district court with directions that the judgment be modified to state that appellants are guilty of only one conviction under 18 U.S.C. § 924(c) for the conduct charged in Count 11--the count related to use of a machine gun. See United States v. Moore, 958 F.2d 310, 314 (10th Cir.1992) (where one of two § 924(c) counts charged the use of a machine gun, "it would be contrary to the intent of Congress to dismiss the more serious charge and penalty").
 
 VI. Failure to Instruct Jury on Self-Defense
 
 68
 Johnson and Spears assert that the district court erred by failing to give a jury instruction on self-defense related to the counts charging that defendants used or carried firearms in violation of 18 U.S.C. § 924(c). At trial, Johnson urged the theory that appellants took up arms to protect themselves from armed, camouflaged intruders who they thought had just gunned down their friend, Jerry Spears. Appellants argue that a self-defense instruction would have allowed the jury to properly consider this theory. When reviewing jury instructions on appeal, we read and evaluate the instructions in their entirety to "determine whether the instructions ... fairly, adequately and correctly state the governing law and provide the jury with an ample understanding of the applicable principles of law and factual issues confronting them." United States v. Denny, 939 F.2d 1449, 1454 (10th Cir.1991). We reverse the district court's judgment "only if error is prejudicial." United States v. DeSoto, 950 F.2d 626, 631 (10th Cir.1991).
 
 
 69
 We conclude that neither the law relevant to § 924(c) nor the facts of this particular case warrant reversal based on the district court's refusal to give a self-defense instruction. Section 924(c)(1) punishes any person who "during or in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm." The clear intent of the statute is to deter even the mere association of firearms with illegal activities such as drug trafficking. We recognize that drug traffickers often are motivated to carry firearms in order to protect themselves, protect their drug trafficking operations, and "intimidat[e] those encountered in the course of drug transactions." McKinnell, 888 F.2d at 674. Given the clear intent of § 924(c), we agree with the Sixth Circuit that, once the association between the use of firearms and drug trafficking is shown, any additional finding that self defense motivated use of the firearms is not relevant to a conviction under § 924. United States v. Poindexter, 942 F.2d 354, 361-62 (6th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 615, 116 L.Ed.2d 637 (1991).
 
 
 70
 Further, we find no evidence in the record that indicates that appellants armed themselves only after they saw the federal agents and because they feared for their personal well-being. Instead, the evidence indicates that firearms were already readily accessible to appellants and that appellants discharged the firearms only after they knew that law enforcement officials were present. Therefore, we hold that the district court properly rejected appellants' self-defense instruction.
 
 VII. Amphetamine as a Controlled Substance
 
 71
 Johnson and Spears also contend that their convictions for conspiracy to manufacture, attempt to manufacture, possession with intent to distribute, and maintaining a dwelling for the purpose of manufacturing a controlled substance should be reversed because amphetamine is not a "controlled substance" and, therefore, is not subject to the Controlled Substances Act. We disagree. In United States v. Youngblood, 949 F.2d 1065 (10th Cir.1991), we recently held that although "[t]he FDA has granted a specific exception for the ingredients contained in the Rynal and Vicks inhalers ..., other uses or combinations of methamphetamines or its isomers remain controlled substances under Schedule II until the FDA approves and authorizes a specific exception." Id. at 1066.[13] Therefore, we hold that appellants' argument, which parallels the claim we rejected in Youngblood, lacks merit.
 
 VIII. Sentence Pursuant to 21 U.S.C. § 841(b)
 
 72
 Johnson and Spears contend that the district court erroneously sentenced them under subparagraph (A) of 21 U.S.C. § 841(b)(1) when it should have sentenced them pursuant to subparagraph (D), which provides a sentence of no greater than ten years. The district court sentenced Spears to 240 months' imprisonment on Count 1 and sentenced Johnson to 210 months' imprisonment on each of Counts 1, 4, and 5; each of these counts either charged a violation of § 841(a) or charged a conspiracy for which a violation of § 841(a) was the object. Johnson and Spears argue that § 841(b)(1)(A) does not include penalties for offenses related to "amphetamine" and, therefore, that they should have been sentenced under § 841(b)(1)(D). However, our review of the statute indicates that neither subparagraph (A) nor subparagraph (D) is the statutory provision authorizing punishment for violations of § 841(a) related to amphetamine. Instead, § 841(b)(1)(C)--which authorizes imposition of a sentence of "imprisonment of not more than 20 years"--is the applicable penalty provision for amphetamine. Subparagraph (C) applies to any "controlled substance in schedule I or II except as provided in subparagraphs (A), (B), and (D)." We find no reference to "amphetamine" in subparagraphs (A), (B) or (D). Amphetamine was a schedule II controlled substance at the time Johnson and Spears committed the offenses alleged in Counts 1, 4, and 5. 21 C.F.R. 1308.12(d). Because the district court properly sentenced Spears pursuant to United States Sentencing Guidelines § 2D1.1(a)(3) and because that Guideline is consistent with the penalty provisions of § 841(b), we reject Johnson's and Spears' argument.
 
 
 73
 IX. Denial of Brady Material and Denial of Separate Trial
 
 
 74
 Summerlin contends that the district court erred by failing to grant a mistrial after the government failed to provide Brady v. Maryland material to his counsel and by failing to sever the trial despite antagonistic defenses presented by Summerlin and Behrens. Both of these claims arose out of the inconsistent testimonies of Scott Spears, son of appellant Jerry Spears, regarding Summerlin's and Behrens' possession of an automatic weapon.
 
 
 75
 At trial, Scott Spears testified on direct examination by the government that, just prior to the altercation with federal agents on July 27, 1990, appellants Summerlin and Behrens were inside the cabin. He further stated that, during the altercation, Summerlin had a rifle and Behrens did not have a gun in his possession. During the government's direct examination, the government intimated that Scott Spears previously had stated that Behrens had fired on the federal agents with an automatic weapon. The prosecutor asked him about prior inconsistent statements to Agent Tom Hammon, and he denied having made any such statements. On cross-examination, Scott Spears testified that he never saw Summerlin or Behrens with the MAC-10 and that he never saw Summerlin fire automatic weapons.
 
 
 76
 Later, the government called Marshal Tom Hammon to testify. Hammon stated that he had spoken with Scott Spears about a machine gun and other firearms; prior to his testimony, he had prepared a written synopsis of what Scott Spears told him. He testified that Scott Spears told him that, on July 27, 1990, Buddy Behrens held and shot a MAC-10 machine gun and that Summerlin held a .30 caliber carbine. He also testified that Scott Spears' account to him regarding Behrens' firing of the MAC-10 was consistent with Agent Bryant's testimony concerning a man firing from inside the house near the east porch. However, Bryant had testified that Summerlin (not Behrens) emerged, without a shirt on, from the cabin and fired a long burst of automatic gunfire.
 
 
 77
 After the close of the evidence, Behren's counsel requested an instruction that the jury consider Scott Spears' out-of-court statements (to Marshal Hammon and to the Grand Jury) only for purposes of impeachment and not as evidence or proof of the commission of the charged offenses. The district court submitted such an instruction to the jury.[14] Counsel for Summerlin opposed this instruction because the out-of-court statements implied that Behrens, and not Summerlin, had fired an automatic weapon. Summerlin also moved for a mistrial on two grounds. First, he argued that the defendants were not privy to the conflicting testimony that Scott Spears gave to Hammon before trial. Second, he argued that he was entitled to a separate trial because the testimony at trial required that attorneys for Summerlin and Behrens argue against one another as to who fired an automatic weapon at federal agents on July 27, 1990.
 
 
 78
 We review de novo an appellant's claim that the government failed to disclose evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). United States v. Rogers, 960 F.2d 1501, 1510 (10th Cir.1992). In Brady, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." 373 U.S. at 87, 83 S.Ct. at 1196-97. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). We hold that the facts of the this case do not support a Brady violation.
 
 
 79
 Summerlin argues that the government should have informed him that Marshal Hammon had spoken with Scott Spears and should have given him a copy of Hammon's synopsis of his discussion with Scott Spears. The record, however, indicates that Summerlin's counsel was aware of Hammon's conversation with Scott Spears and was provided at trial with a copy of Hammon's synopsis upon request. See Rogers, 960 F.2d at 1510 ("we do not need to address the materiality issue when the evidence is produced" and "[t]he Brady rule is not violated when the material requested is made available during trial"). Further, Summerlin has not asserted how the alleged suppression of evidence affected the trial. We assume he argues that the allegedly suppressed information would have helped his counsel show that Summerlin did not fire an automatic weapon at federal agents on July 27, 1990. However, the record is replete with other evidence on which the jury could have relied to convict Summerlin of using or carrying an automatic weapon during or in relation to a drug trafficking offense under 18 U.S.C. § 924(c).[15] Therefore, we conclude that the evidence allegedly suppressed was not material in light of all the evidence presented at trial.
 
 
 80
 We review the district court's decision not to grant a mistrial or a separate trial based on conflicts among codefendants under an abuse of discretion standard. United States v. Esch, 832 F.2d 531, 537 (10th Cir.1987), cert. denied, 485 U.S. 908, 108 S.Ct. 1084, 99 L.Ed.2d 242, cert. denied, 485 U.S. 991, 108 S.Ct. 1299, 99 L.Ed.2d 509 (1988). To demonstrate that he was entitled to a severed trial, Summerlin must make a "strong showing of prejudice," id., and must demonstrate "that failure to sever resulted in the denial of his right to a fair trial," United States v. Peveto, 881 F.2d 844, 857 (10th Cir.), cert. denied, 493 U.S. 943, 110 S.Ct. 348, 107 L.Ed.2d 336 (1989). In Peveto, we stated that
 
 
 81
 [s]everance may be necessary when defenses are "so antagonistic that they are mutually exclusive." A mere conflict of theories or one defendant's attempt to cast blame on another does not require severance. Rather, the conflict between co-defendants "must be so intense that there is a danger the jury will unjustifiably infer from the conflict alone that both defendants are guilty." The defendant must demonstrate that the acceptance of one party's defense would tend to preclude the acquittal of the other, or that the guilt of one defendant tends to establish the innocence of the other.
 
 
 82
 Id. (quoting Esch, 832 F.2d at 538) (citations omitted). Based on this standard, we conclude that Summerlin was not entitled to a separate trial.
 
 
 83
 Summerlin suggests that he was prejudiced by the conflicting testimonies regarding who held and fired an automatic weapon from the cabin on July 27, 1990. Summerlin asserts that if the jury
 
 
 84
 believed Agent Bryant then Appellant Summerlin must be found guilty of Count 11 and sentenced to a term of imprisonment for a term of 30 years. If they believed the allegations of Scott Spears to Tom Hammon then Buddy Behrens would have to be found guilty of Count 11 and sentenced to a term of 30 years imprisonment.
 
 
 85
 We disagree that the antagonistic defenses of Summerlin and Behren's were prejudicial. As stated above, the record is replete with evidence--independent of what occurred during the gun battle with federal authorities--to support a jury's finding that Summerlin used or carried an automatic weapon during or in relation to a drug trafficking offense. Therefore, Summerlin's theory of defense related to the gun battle was not mutually exclusive to Behren's, nor would acceptance by the jury of Summerlin's theory of defense have necessarily established Summerlin's innocence and Behren's guilt. Consequently, we conclude that Summerlin has failed to make a sufficient showing of prejudice.
 
 X. Admission of Impeachment Evidence
 
 86
 Behrens contends that the district court committed reversible error by allowing the government to question Marshal Hammon at trial about the statements Scott Spears made to Hammon regarding the events of July 27, 1990. We review a district court's decision to admit or exclude evidence under an abuse of discretion standard. United States v. Alexander, 849 F.2d 1293, 1301 (10th Cir.1988).
 
 
 87
 When the government called Scott Spears as a trial witness, he testified that Behrens did not possess a gun--or at least he could not recall whether Behrens possessed a gun--during the altercation with federal authorities on July 27, 1990. The trial record indicates that this was not the testimony the prosecutor expected and that Scott Spears had previously told the Grand Jury that Behrens had fired on federal agents with an automatic weapon.
 
 
 88
 As its final witness, the government called Marshal Tom Hammon. When the prosecutor began to question Hammon about a conversation he had with Scott Spears, Behrens' counsel objected on grounds that Hammon's testimony was hearsay. The prosecutor advised the court that the questions were intended to impeach Scott Spears' trial testimony. Behrens' counsel then responded that before the government could use Hammon's testimony to impeach the testimony, Scott Spears should be given the opportunity to explain or deny his prior statement. The district court overruled the objection and allowed the prosecutor to continue questioning Hammon about Scott Spears' statement.[16] However, prior to Scott Spears' testimony, the court gave a limiting instruction to the jury that the testimony should only be considered for impeachment purposes. As discussed above, the district court also included a similar caution in the instructions submitted to the jury after the close of evidence.
 
 
 89
 On appeal, Behrens asserts that the government's motive for introducing Scott Spears' statement to Hammon was not to impeach, but instead to submit the otherwise inadmissible statement to the jury as substantive evidence of Behren's guilt. Under the Federal Rules of Evidence, the government was entitled to impeach its own witness. Fed.R.Evid. 607. However, we have held that "a prosecutor may not use impeachment as a guise for submitting to the jury substantive evidence that is otherwise unavailable." United States v. Silverstein, 737 F.2d 864, 868 (10th Cir.1984). In United States v. Peterman, 841 F.2d 1474 (10th Cir.1988), cert. denied, 488 U.S. 1004, 109 S.Ct. 783, 102 L.Ed.2d 774 (1989), we explained that this rule forbids a prosecutor from calling a witness--in this case Scott Spears--when the prosecution's primary intent is not to elicit substantive evidence from the witness, but to introduce otherwise inadmissible impeachment evidence to contradict the witness' statements at trial. Id. at 1479-80 ("[t]he decisive issue for us is what the government expected the witness to say"). In Peterman, the prosecutor contended that it expected the witness (a codefendant) to admit his guilt, whereas the witness stated that he had never told the prosecutor that he would do so. The district court made a credibility determination and found that the government had reasonably expected the witness to admit his guilt. On appeal, we held that the district court did not abuse its discretion by allowing the government to introduce evidence of the witness' prior conviction for impeachment purposes. Id. at 1480.
 
 
 90
 Our review of the record suggests that the government expected Scott Spears to testify that Behrens held and fired a machine gun at federal agents. Behrens concedes that Scott Spears previously made inconsistent statements to the Grand Jury and to Marshal Hammon. Furthermore, the record in no way indicates--and Behrens does not assert--that the government had any knowledge before trial that Scott Spears might change his story. Because the record does not support a conclusion that the government's primary motive in calling Scott Spears as a witness was to introduce otherwise inadmissible impeachment testimony, we hold that the district court did not abuse its discretion in allowing the government to question Marshal Hammon for the purpose of impeaching Scott Spears.
 
 
 91
 XI. Upward Sentence Adjustment for Assault on a Law Enforcement Officer
 
 
 92
 Finally, Behrens asserts that the district court erred by adjusting his sentence upward by three levels pursuant to United States Sentencing Guidelines (U.S.S.G.) § 3A1.2(b). That section provides for a three-level enhancement to a defendant's base offense level if
 
 
 93
 during the course of the offense or immediate flight therefrom, the defendant or a person for whose conduct the defendant is otherwise accountable, knowing or having reasonable cause to believe that a person was a law enforcement or corrections officer, assaulted such officer in a manner creating a substantial risk of bodily injury.
 
 
 94
 U.S.S.G. § 3A1.2(b). Behrens concedes that evidence in the record supports a finding that an assault on law enforcement officials occurred. Behrens contended at the sentencing hearing, and argues again on appeal, that evidence introduced at trial was insufficient to support the district court's conclusion that Behrens participated in an assault on law enforcement officers.
 
 
 95
 We apply a "due deference" standard when reviewing the district court's application of the sentencing guidelines to the facts; we "review fully for errors of law"; and we review the district court's factual determinations under a clearly erroneous standard. United States v. Haar, 931 F.2d 1368, 1377 (10th Cir.1991).
 
 
 96
 The record contains circumstantial evidence that Behrens took part in the assault on the federal agents on July 27, 1990. The record clearly suggests that Behrens was present in the house immediately before the gun battle. Marshal Hammon testified that, in addition to gunfire from two automatic weapons, he heard gunfire from a third, semi-automatic weapon. Coupled with ample evidence in the record that three persons were either in the house or positioned near the house after Jerry and Scott Spears surrendered, Marshal Hammon's testimony supports an inference that each of the three persons in or near the house fired a weapon at the federal officers.
 
 
 97
 In addition, Marshal Hammon testified that Scott Spears told him that Behrens held and fired the MAC-10 machine gun during the gun battle. Although such hearsay is generally not admissible at trial, the district court may consider hearsay in determining a defendant's sentence as long as some indicia of that hearsay's reliability exists. U.S.S.G. § 6A1.3 & cmt.; see also United States v. Hershberger, 962 F.2d 1548, 1554 (10th Cir.1992); United States v. Shewmaker, 936 F.2d 1124, 1129 (10th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 884, 116 L.Ed.2d 788 (1992). Here, Hammon's testimony regarding Scott Spears' out-of-court statements is corroborated by Scott Spears' grand jury testimony and by Hammon's observation that three different guns were fired by the three persons who were in or near the cabin.
 
 
 98
 Finally, we note that "[s]entencing courts are authorized, under [U.S.S.G.] § 1B1.3, to consider a broad spectrum of relevant information in determining the guideline range." United States v. Smith, 930 F.2d 1450, 1455 (10th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 225, 116 L.Ed.2d 182 (1991). Section 1B1.3(a)(1) permits the district court, when making sentencing adjustments, to consider
 
 
 99
 all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or that otherwise were in furtherance of that offense.
 
 
 100
 (Emphasis added.) In addition, Application Note 1 to U.S.S.G. § 1B1.3 provides that "[i]n the case of criminal activity undertaken in concert with others, whether or not charged as a conspiracy, the conduct for which the defendant 'would be otherwise accountable' also includes conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant." The record indicates that all of the appellants carried and possessed guns and that Spears was in effect patrolling the premises surrounding the cabin on July 27, 1990. This evidence indicates that the potential for an altercation with law enforcement officers was not only reasonably foreseeable by Behrens, but was viewed by the appellants as likely enough to warrant precautionary actions. Based on the evidence linking Behrens to participation in the July 27, 1990 gun battle, in conjunction with conduct for which Behrens is "otherwise accountable," we conclude that the district court was not clearly erroneous in finding that Behrens was a participant in the July 27, 1990 assault on federal law enforcement officers. Therefore, we affirm the adjustment of Behrens' sentence upward by three levels pursuant to U.S.S.G. § 3A1.2(b).
 
 
 101
 In conclusion, we VACATE Johnson's convictions on Count 6; Behrens' conviction on Count 8; Spears' conviction on Count 12; and each appellant's conviction on Counts 13 and 15. We AFFIRM the district court in all other respects and REMAND for resentencing.
 
 
 
 *
 The Honorable John E. Conway, District Judge for the United States District Court for the District of New Mexico, sitting by designation
 
 
 [1]
 Each of the defendants was convicted of conspiracy to commit various drug offenses (Count 1) in violation of 21 U.S.C. § 846; for conspiracy to commit offenses against the United States (Count 2) in violation of 18 U.S.C. § 371; for maintaining a place for the purpose of manufacturing, storing, distributing or using a controlled substance (Count 6) in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2; for using or carrying firearms during or in relation to a drug trafficking crime (Counts 11 and 15) in violation of 18 U.S.C. § 924(c) and 18 U.S.C. § 2; and for possession of an unregistered machine gun (Count 13) in violation of 26 U.S.C. § 5861(d) and 18 U.S.C. § 2. The jury also returned guilty verdicts against Johnson, Behrens and Summerlin for attempting to manufacture amphetamine (Count 4) in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2. Guilty verdicts were returned against Johnson and Behrens for leasing an enclosure for the manufacture of amphetamine (Count 8) in violation of 21 U.S.C. § 856(a)(2) and 18 U.S.C. § 2. The jury also found Johnson guilty of possession of amphetamine (Count 3) in violation of 21 U.S.C. § 844(a) and of possession with intent to distribute amphetamine (Count 5) in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The jury also returned separate guilty verdicts against Spears for using or carrying a firearm during and in relation to the commission of a drug trafficking crime (Count 12) in violation of 18 U.S.C. § 924(c) and 18 U.S.C. § 2 and for possession of a firearm after a former felony conviction (Count 16) in violation of 18 U.S.C. § 922(g)
 
 
 [2]
 In the section of his appellate brief dedicated to his motion for a continuance of the suppression hearing, Johnson also argues that "the trial court's insistence on expeditiousness pervaded the proceedings, right up to the end, when counsel for Johnson was given 40 minutes to close." These cursory arguments are made without substantiation from the record or without an indication of how Johnson's rights were prejudiced, and we conclude that they are without merit
 
 
 [3]
 Section 922(o) provides,
 (1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.
 (2) This subsection does not apply with respect to-- ...
 (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.
 18 U.S.C. § 922(o).
 
 
 [4]
 The following is a portion of the plenitude of direct and circumstantial firearms evidence introduced by the government. During the spring of 1990, Ranger Dekota Cagle testified that he heard automatic weapon fire in the area of the cabin and later saw Behrens holding what looked like an AK-47 before he walked into the cabin. He also testified that, when he returned to look at the cabin the next day, he smelled the distinctive odor of "amphetamine crank." He also testified that he had experience with "crank" labs. Scott Spears testified that Behrens was present at the cabin on July 27, 1990 and had been there previously. In addition, he testified that he had seen clips to a MAC-10 machine gun in the front room of the cabin
 Agent Bryant testified that a man that he knew to be Clay Johnson fired an automatic weapon at him during the July 27, 1990 altercation. Bryant believed the weapon to be an AK-47. Johnson's wife testified that Johnson owned an AK-47. Joe Pierce also testified that he had seen both an AK-47 machine gun and a MAC-10 machine gun at Johnson's house.
 Agent Bryant and Marshal Hammon confiscated a Colt AR-15 and a .9mm Smith and Wesson pistol that Spears possessed when he confronted the agents on July 27, 1990.
 
 
 [5]
 In particular, we note that there was ample evidence for the jury to reasonably infer that appellants conspired to manufacture amphetamine and conspired to use firearms to protect their efforts. In United States v. Morehead, 959 F.2d 1489 (10th Cir.1992), we stated that in order for a conspiracy or unlawful agreement to exist, "the Defendants' conduct must be interdependent with the conduct of the alleged coconspirators." Id. at 1500. "Interdependence is present if 'the actions of a defendant ... facilitated the endeavors of other alleged coconspirators or facilitated the venture as a whole.' " Id. (quoting United States v. Horn, 946 F.2d 738, 740-41 (10th Cir.1991)). After carefully reviewing the record, we conclude that the actions of each appellant were interdependent and that each appellant's involvement was more than " 'casual transactions' or 'mere association' with persons involved in criminal activity." Id. (quoting Horn, 946 F.2d at 741)
 
 
 [6]
 In analyzing whether appellants' numerous convictions violate the Double Jeopardy Clause, we note that the district court imposed concurrent sentences for the substantive drug offense convictions and for the conspiracy convictions. Sentences for the several convictions for using or carrying firearms during or in relation to a drug trafficking crime (in violation of 18 U.S.C. § 924(c)) were imposed concurrently with one another, but consecutively with sentences for the substantive drug offense and conspiracy convictions. Additionally, the district court ordered appellants to pay special assessments for each count on which they were convicted. We review double jeopardy or multiplicity challenges even when they relate to convictions receiving concurrent sentences because the challenges " 'go[ ] to the fundamental validity of one conviction,' " Morehead, 959 F.2d at 1506 (quoting United States v. Dashney, 937 F.2d 532, 541 (10th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 402, 116 L.Ed.2d 351 (1991)), and because "a criminal conviction, in addition to imprisonment and a penalty assessment, presents 'potentially adverse collateral consequences.' " Id. (quoting Ball v. United States, 470 U.S. 856, 865, 105 S.Ct. 1668, 1673, 84 L.Ed.2d 740 (1985))
 
 
 [7]
 The indictment alleged that Johnson, Spears and the other codefendants conspired to commit, among several others, the following drug offenses: "manufacture amphetamine"; "possess with the intent to distribute amphetamine"; "maintain a place for the purpose of manufacturing, distributing, or using any controlled substance"; "manage or control any building, room, or enclosure, either as owner, lessee, agent, employee, or mortgagee, and ... rent, lease, or make available for use, with or without compensation, the building, room, or enclosure for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance."
 
 
 [8]
 In Blockburger, 284 U.S. at 304, 52 S.Ct. at 182, the Supreme Court stated that
 where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.
 
 
 [9]
 Although Behrens and Summerlin did not specifically raise Double Jeopardy Clause arguments in their appellate briefs, we notice this and other double jeopardy issues sua sponte because they "go[ ] directly to the validity of [their] multiple criminal convictions." United States v. Nall, 949 F.2d 301, 308 (10th Cir.1991)
 
 
 [10]
 In Palacios, the defendant entered a bank with 100 counterfeit $100 bills. He attempted to pass 44 of them; the other 46 were found in his pockets after he was arrested at the bank and searched. Because the defendant had not demonstrated an intent to pass the bills found in his pockets, those bills constituted a criminal act of possession separate from his attempt to pass the other 44, even though all of the bills were at one time together, and even though all of the bills were found on bank property. Palacios, 835 F.2d at 231-33
 
 
 [11]
 Of course, as to the amphetamine for which Johnson was convicted under § 841(a), a claim under § 844(a) would violate double jeopardy as a lesser included offense. See Burns, 624 F.2d at 104
 
 
 [12]
 In pertinent part, 18 U.S.C. § 371 provides that "[i]f two or more persons conspire ... to commit any offense against the United States ... and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."
 
 
 [13]
 In relevant part, 21 U.S.C. § 811(g)(1) provides that
 [t]he Attorney General shall by regulation exclude any non-narcotic substance from a schedule if such substance may, under the Federal Food, Drug, and Cosmetic Act, be lawfully sold over the counter without a prescription.
 
 
 [14]
 The instruction provided as follows:
 Evidence that at some other time the witness Scott Spears has said something which is inconsistent with his testimony given during direct examination by the Government's counsel in this trial may be considered for the sole purpose of judging the credibility of Scott Spears, but it shall not be considered as evidence or proof of the truth of such other statement.
 
 
 [15]
 Trial evidence indicates that Summerlin had spent time at the cabin and was there on July 27, 1990. Agent Bryant testified that Summerlin emerged from the door of the cabin and fired a long burst of gunfire from an automatic weapon. Scott Spears testified that he had seen ammunition clips for a MAC-10 lying against a chair in the front room of the cabin where Summerlin and the other defendants often sat and slept. When federal authorities searched the cabin, they found automatic weapons and ammunition for automatic weapons. In conjunction with the plenitude of evidence presented regarding the manufacture and attempted manufacture of amphetamine at the cabin, the evidence related to Summerlin and to firearms is sufficient to meet the "readily accessible" test adopted in McKinnell, 888 F.2d at 674-75, and to support a conviction under § 924(c)
 
 
 [16]
 The record indicates that Scott Spears, during the government's direct examination, was afforded the opportunity to explain or deny his prior inconsistent statements and that defense counsel were afforded the opportunity to question Scott Spears about his prior statements. See Fed.R.Evid. 613(b)