FILED
United States Court of Appeals
Tenth Circuit

August 29, 2013

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

No. 11-3317

ANTHONY BROOKS,

Defendant - Appellant.

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 2:10-CR-20078-JWL-1)**

Mark A. Thomason, Law Office Of Mark Thomason, LLC, Blue Springs, Missouri, for Defendant-Appellant.

Leon Patton, Assistant United States Attorney, Kansas City, Kansas (Barry R. Grissom, United States Attorney, with him on the brief) for Plaintiff-Appellee.

Before **TYMKOVICH**, **EBEL**, and **HOLMES**, Circuit Judges.

**HOLMES**, Circuit Judge.

Anthony Brooks was convicted, after a jury trial, of armed bank robbery in violation of 18 U.S.C. § 2113(a), (d). He now appeals his conviction, arguing that: (1) the evidence at trial was insufficient, as a matter of law, to support his

conviction for armed bank robbery; (2) the district court erred by admitting DNA evidence linking him to the crime scene; (3) the district court's refusal to strike the testimony of the government's expert witness constituted an abuse of discretion; (4) the district court abused its discretion by allowing the government to introduce evidence that Mr. Brooks was in possession of large amounts of cash several months following the robbery; and (5) the district court abused its discretion by denying Mr. Brooks's motion for a new trial based on alleged juror misconduct.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

# I

## A

The Security Bank of Kansas City was robbed on December 29, 2006. Gwendolyn Gilbert and Mamie Sherrod were the tellers responsible for opening the bank on the day of the robbery.  In accordance with the bank's standard procedure, Ms. Gilbert entered the bank first, locked the door behind her, turned on the lights, and then returned to the front door to let Ms. Sherrod into the bank. As Ms. Sherrod exited her vehicle and approached the bank door, a man with a gun rushed to her side.  The man was dressed in all black, wore a mask and gloves, and was pointing a gun at Ms. Sherrod.  Ms. Sherrod could not see the man's skin, but "figured he was a black man" because of his voice.[1]  R., Vol. 2, at

---

[1]     Ms. Sherrod is an African-American.

117 (Trial Tr., dated Mar. 3, 2011).

Ms. Gilbert testified that she let the robber and Ms. Sherrod into the bank because she "didn't want to leave [Ms. Sherrod] out there by herself with [the gunman]." *Id.* at 471. According to the surveillance video shown at trial, the robber entered the bank at 6:29 a.m. At gunpoint, the robber directed Ms. Sherrod and Ms. Gilbert to enter the bank's vault room where the safes were located. The robber then instructed Ms. Sherrod to open the safe that contained the tellers' individual cash drawers. To open this particular safe it was necessary for one employee to use a key while another employee entered a combination. The same employee cannot simultaneously turn the key and enter the combination. As Ms. Sherrod began the process of opening the safe by using her key, Ms. Gilbert attempted to enter her combination. While Ms. Gilbert was struggling with the combination, the robber had Ms. Sherrod sit on the floor and bound her wrists with plastic ties.

If Ms. Gilbert had been able to open the safe, the robber would have only had access to a relatively small amount of money kept in Ms. Sherrod's teller drawer. However, Ms. Gilbert continued to have difficulty entering her combination, and the robber hit her with his gun (although Ms. Sherrod later testified that "[the robber] didn't hit [Ms. Gilbert] that hard"). *Id.* at 125. Ms.

Gilbert then moved to the vault teller's safe, which she could open by herself.[2] Ms. Gilbert was able to successfully open the vault teller's safe. After Ms. Gilbert had opened the safe, the robber instructed her to sit on the floor and bound her ankles and wrists with plastic ties. The robber also bound Ms. Sherrod's ankles (he had previously bound only her wrists). The robber left the two women seated on the floor and began removing the cash from the vault teller's safe. At this time, the robber asked Ms. Sherrod for the keys to her vehicle. Ms. Sherrod responded that she had left her keys locked inside her car because she could unlock her vehicle using a combination code. The robber did not ask Ms. Gilbert for her keys. The robber then exited the room, telling the women not to come out of the room, as he shut the door. The robber took $246,186 in United States currency from the safe.

After ten or fifteen minutes had passed, Ms. Gilbert was able to get Ms. Sherrod's cell phone out of her pocket, and Ms. Sherrod called the police. Ms. Sherrod could not reach her cell phone without Ms. Gilbert's help because Ms. Sherrod's hands were tied in front of her.

The police arrived at the bank around 7:00 a.m. One of the responding officers, Officer Ken Winzer, freed the two women by cutting the plastic ties the

---

[2]     Ms. Gilbert had been promoted to vault teller about a month before the robbery.

robber had used to bind their wrists and ankles.[3]  Officer Winzer testified that he

had noted in his report that "Ms. Gilbert . . . did not seem to be very upset;

whereas, Ms. Sherrod was very emotional and upset."  *Id.* at 166–67.  He also had

noted in his report that "the ties on Ms. Gilbert were not as tight as they were on

Ms. Sherrod," and explained that "[this] seemed out of the ordinary."  *Id.* at 167.

Officer Winzer left the ties on the floor where they had fallen after he cut

them.  Although he could not say for sure, Officer Winzer did not believe he had

touched the ties with anything other than his knife blade.  Officer Winzer testified

that he left the ties on the floor "[t]o preserve any evidence that might [have]

be[en] on them."  *Id.* at 165.  He did not see "who actually picked them up and

collected them."  *Id.* at 165–66.  Although the ties were not immediately

collected, Officer Winzer testified that he did not see anyone touch the ties after

they had been cut.

The plastic zip ties were later collected by Crime Scene Investigators

---

[3]  There is some conflict in the record as to whether Officer Winzer had to cut the plastic tie off of Ms. Sherrod's wrists.  He testified that he did not need to cut the tie because Ms. Sherrod had been able to remove it herself.  However, Ms. Sherrod testified that she did not remove the zip tie from her wrists and that the officer had to cut the tie.  Supporting the accuracy of Ms. Sherrod's testimony, both Ms. Sherrod and Ms. Gilbert testified that when Ms. Sherrod placed the 911 call, Ms. Gilbert had to get Ms. Sherrod's phone out of Ms. Sherrod's pocket because Ms. Sherrod could not reach the phone with her wrists bound.

("CSI") Greg Burris and John Nash.[4] Officer Burris testified that there was no indication the zip ties "had been moved or touched between the time [he] first saw them and the time that [he] actually picked them up." *Id.* at 203. In addition to collecting the zip ties, Officers Nash and Burris collected a piece of blue latex, which "appeared to be a broken-off piece of a latex glove." *Id.* at 165.

**B**

The zip ties and glove fragment were submitted to the Johnson County Crime Lab in May 2006. Bethany Stone, a forensic scientist and the government's DNA expert, began examining the zip ties and glove fragment in June 2008. To process the ties, Ms. Stone "used a sterile swab and water to collect possible skin cell transferred DNA from the closure ends of the zip ties." *Id.* at 275. She "did not swab the entire zip tie" because she wanted to focus on "obtain[ing] possible suspect DNA as opposed to . . . possibly getting an abundance of victim DNA." *Id.* at 275–76. She did not see "any evidence on any of the[] zip ties of any sort of fluid," such as blood, saliva, or semen. *Id.* at 276. Ms. Stone labeled the four zip ties as Lab Items 1.1, 2.1, 3.1, and 4.1. She labeled the glove fragment as Lab Item 5.1.

Ms. Stone found mixtures of DNA (i.e., DNA from at least two individuals)

---

[4]     Officers Burris and Nash collected the zip ties together, with one officer collecting the ties off of the floor and putting them in bags, while the other officer held the evidence envelope.

on all of the items except zip tie 2.1, where she found only a small amount of male DNA. Ms. Stone was able to determine that there was male DNA on all four zip ties and the glove. At the time of this original analysis, Ms. Stone only had DNA from Ms. Sherrod and Ms. Gilbert to compare to the DNA profiles obtained from the zip ties. She was able to exclude Ms. Sherrod as a source for all of the DNA found on the zip ties. Ms. Stone was able to exclude Ms. Gilbert as a source for all of the DNA found on the zip ties labeled 2.1, 3.1, and 4.1 and the glove fragment, labeled 5.1. She was not able to form a conclusion as to whether some of the DNA on the zip tie labeled 1.1 belonged to Ms. Gilbert.

**C**

In January 2008, more than a year after the robbery, Jerome Gilbert, Jr., the just-divorced ex-husband of Ms. Gilbert, told the FBI he suspected that his former co-worker, Mr. Brooks, had committed the robbery. Mr. Brooks is an African-American. Although Mr. and Ms. Gilbert did not divorce until January 2008, Ms. Gilbert had been in a romantic relationship with Mr. Brooks "[s]ince about 2005." *Id.* at 466–67. In December 2006 (the month of the bank robbery), Ms. Gilbert lived in the family home but slept in an apartment above the garage. At the time of trial, she testified that Mr. Brooks visited her in the apartment the night before the robbery and the two had sexual intercourse. Afterwards she "let him out and went back to bed in the apartment." *Id.* at 469. She did not take a bath or shower that night or the next morning before going to work at the bank.

According to phone records admitted into evidence at trial, there were 148 calls between Mr. Brooks's phone and Ms. Gilbert's phone during the four-week period immediately before the robbery. However, there were no calls between the two numbers between December 24, 2006 (five days prior to the robbery), and March 2, 2007. Mr. Brooks's phone records also showed that at 6:19 a.m., on the morning of the robbery, he made a call to his wife's cell phone that lasted ten minutes. The call therefore would have ended at 6:29 a.m., almost exactly when the robber entered the bank.

**D**

In May 2009, the FBI obtained saliva samples from Mr. Brooks and submitted them to the Johnson County Sheriff's Office laboratory for analysis. Ms. Stone analyzed the samples and created a profile for Mr. Brooks's DNA. Based on this profile, and her previous analysis of the DNA from the zip ties, Ms. Stone could not reach a conclusion as to whether Mr. Brooks was the source of some or all of the male DNA on zip ties 1.1, 2.1, or 4.1 and the glove fragment (i.e., Lab Item 5.1). She did, however, determine that Mr. Brooks was the main source of the male DNA on zip tie 3.1.

At trial, Ms. Stone explained that she "believe[d] the material [she] had was touch DNA"—DNA that is transferred onto a surface because "a person has touched something and in the process of doing that has transferred skin cells." *Id.* at 296–97. According to Ms. Stone, it would have been "very highly unlikely"

for the DNA from Mr. Brooks to have been transferred to the zip tie through "secondary transfer"—e.g., where "a person's DNA may have been on one of the victim tellers and then from that victim teller [is] transferred to the tie." *Id.* at 298. In contrast, Mr. Brooks's DNA expert, Stephanie Beine,[5] testified that there was a "reasonable possibility" that Mr. Brooks's DNA could have been on zip tie 3.1 as a result of his "recent sexual intercourse" with Ms. Gilbert. *Id.* at 571.

**E**

The presence of Mr. Brooks's DNA at the crime scene was not the only evidence linking him to the robbery. In addition, there was evidence that Mr. Brooks's financial status inexplicably changed following the robbery. Specifically, on two separate occasions, approximately eight months following the robbery, Mr. Brooks was observed in possession of large amounts of cash. The first such occasion occurred in approximately June 2007 when Mr. Brooks contracted with Bret Ferguson to replace the driveway at his Kansas City home. Mr. Ferguson testified that Mr. Brooks gave him a down payment of three or four thousand dollars in $100 dollar bills that Mr. Brooks took out of a box. Mr. Ferguson testified that the box was approximately a foot deep, and appeared to be

---

[5] Individuals must complete specific course work before becoming a DNA scientist for forensics. Ms. Beine admitted at trial that she had not completed two of the required courses when she first started testifying as a "DNA expert" in civil trials in 2001. She did not actually complete the required course work until 2004.

stacked with rows of $100 bills.

The second occasion occurred on August 15, 2007, when Mr. Brooks was the subject of a traffic stop by a police officer who testified that he had observed several thousand dollars in cash in the console of Mr. Brooks's car. The officer testified that the cash was in ten and twenty dollar denominations. In addition, there was testimony from Mr. Gilbert that in the summer of 2007, Mr. Brooks informed him that he had "a couple hundred thousand" dollars stored in his home. Mr. Brooks told Mr. Gilbert that he had made the money on eBay.

The money observed to be in Mr. Brooks's possession in the summer of 2007 could not be explained by his financial records. Specifically, Department of Labor records showed that Mr. Brooks had reported wages of just over $22,000 for 2005 and $675 for the first quarter of 2006. He had been drawing unemployment benefits from April 2006 until late November 2006. Mr. Brooks quit drawing unemployment benefits approximately one month before the robbery. And he had no reported income from that point until December 31, 2007, approximately one year after the robbery.

**F**

Prior to his jury trial, Mr. Brooks filed motions *in limine* to exclude: evidence of the cash observed in his possession in the summer of 2007 and the DNA evidence connecting him to the robbery. The district court denied Mr. Brooks's motion *in limine* to exclude evidence of the post-robbery cash. The

-10-

district court originally took the motion *in limine* regarding DNA evidence under advisement, *see id.* at 35, and then allowed the evidence at trial after finding that "the chain of custody is quite adequate," *id.* at 250.

At trial, Mr. Brooks moved to strike the testimony of the government's DNA expert, Ms. Stone, on the grounds that "the testing actually performed by Ms. Stone (the swabbing of just the ends of the zip ties) was materially different than the testing reported (a 'general swab'), and provided to the defense in advance of trial." Aplt. Opening Br. at 46. Ms. Stone testified on cross-examination that she had written in her report that she took a "general swab" when collecting the DNA from the zip ties, *see* R., Vol. 2, at 307, when in fact, she had only swabbed the ends of the zip ties. She acknowledged that the phrase "general swab" could cause another analyst to conclude that she had swabbed all areas of the zip ties, and that there were no additional areas—beyond those she already had examined—that could be swabbed and tested for DNA evidence. *Id.* at 309–10. The district court denied Mr. Brooks's motion after his counsel conceded that he "did not" "cite any authority in th[e] motion . . . for the proposition that a relatively bare bones disclosure . . . gives rise to a basis to strike the testimony to the extent that there is a semantic difference between the sides over what the meaning of [a] term is." *Id.* at 539. Upon learning of the purported discrepancy between Ms. Stone's report and her testimony, Mr. Brooks's counsel did not request a continuance to enable him to more effectively

-11-

address the matter.

Upon the close of evidence and conclusion of deliberations, the jury returned a guilty verdict. "After trial, but before sentencing, the parties both learned on July 19, 2011, that one of the jurors, James Clark, was under federal investigation at the time of voir dire." Aplee. Br. at 26 (footnote omitted). Mr. Brooks moved for a new trial or an evidentiary hearing to address potential juror misconduct. The district court held an evidentiary hearing, in which it heard testimony from James Clark (the juror) and arguments from counsel, and subsequently denied the motion. The district court entered judgment, and Mr. Brooks timely appealed his conviction.

## II

On appeal, Mr. Brooks raises five issues. First, Mr. Brooks argues that DNA evidence found at the scene of the crime should have been excluded due to problems with the chain of custody. Second, Mr. Brooks contends that the district court erred by refusing to strike the testimony of the government's expert witness, Ms. Stone. Third, Mr. Brooks argues that the district court erred by admitting evidence regarding large amounts of cash that were seen in Mr. Brooks's possession in the summer of 2007. Fourth, Mr. Brooks contends that there was insufficient evidence to support a conviction for armed robbery. Finally, Mr. Brooks argues that the district court abused its discretion by denying his motion for a new trial based on alleged juror misconduct. We address each of these

arguments in turn, and for the reasons explicated below, uphold the district court's judgment.

**A**

We first turn to Mr. Brooks's contention that the district court erred in admitting DNA evidence found on the plastic zip ties at the crime scene. Mr. Brooks does "not deny that [his] DNA was on one of the zip ties." Aplt. Opening Br. at 33. Nor does he argue that "his DNA was planted" at the crime scene. R., Vol. 2, at 248–49. Rather, Mr. Brooks asserts that "the items containing [the] DNA were carelessly removed by an Officer who was not wearing gloves, then dropped, unlabelled, on the floor of the bank, where they lay unguarded and uncollected." Aplt. Opening Br. at 42. Thus, he contends that "[t]he chain of custody . . . was so incomplete as to render it probable that the zip ties were contaminated." *Id.*

"[W]e review a district court's decision to admit evidence for an abuse of discretion, and we reverse a decision only if it is 'manifestly erroneous.'" *United States v. Irving*, 665 F.3d 1184, 1210 (10th Cir. 2011) (quoting *United States v. McPhilomy*, 270 F.3d 1302, 1312 (10th Cir. 2001)) (internal quotation marks omitted). In other words, "we will not disturb the district court's ruling absent a distinct showing it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment." *United States v. Batton*, 602 F.3d 1191, 1196 (10th Cir. 2010) (quoting *United States v.*

-13-

*Stiger*, 413 F.3d 1185, 1194 (10th Cir. 2005)) (internal quotation marks omitted).

In support of his argument, Mr. Brooks points to the fact that "[n]either Mr. Burris nor Mr. Nash could recall who actually collected the [zip ties], and neither could definitely say whether someone touched the zip ties or piece of blue latex glove prior to the time they arrived on the scene." Aplt. Opening Br. at 40 (citation omitted). Thus, Mr. Brooks argues that "the fact that those items were left unattended for a significant period of time leads to the possibility that they were unintentionally tampered with in some way" and renders the DNA results "wholly unreliable in this case." *Id.* at 41. More specifically, Mr. Brooks points to the "possibility that the handling and bringing in of other individuals could subtract or mask over other DNA that could have been found if it was collected properly." R., Vol. 2, at 249. Like the district court,[6] we conclude that Mr.

---

[6] The district court explained that Mr. Brooks's concerns went "to the weight and not to the admissibility of the evidence here." R., Vol. 2, at 249. Specifically, the district court explained:

> I am persuaded by a preponderance of the evidence that the zip ties were cut off by the officer, let lie on the ground. They were observed by some individuals, but the evidence was it would be highly unlikely that the mere observation at a distance would cross contaminate, and I'm not persuaded that anything like that would have happened here either from the standpoint of adding or subtracting any DNA, and that they were then processed by the CSI officers. The testimony of Mr. Nash [the officer who collected them], to me, is quite probative . . . .

*Id.*

-14-

Brooks's argument on this score is without merit.

It is well established that the "chain of custody need not be perfect for the evidence to be admissible." *United States v. Yeley-Davis*, 632 F.3d 673, 683 (10th Cir. 2011) (quoting *United States v. Johnson*, 977 F.2d 1360, 1367 (10th Cir. 1992)) (internal quotation marks omitted). "Where the chain of custody is imperfect, deficiencies . . . go to the weight of the evidence, not its admissibility; once admitted, the jury evaluates the defects and, based on its evaluation, may accept or disregard the evidence." *Id.* (omission in original) (quoting *United States v. Smith*, 534 F.3d 1211, 1225 (10th Cir. 2008)) (internal quotation marks omitted).

Here, the district court properly determined that the government established a sufficient "foundation entailing a chain of custody . . . to render it improbable" that the DNA on the plastic ties had been "contaminated or tampered with." *Id.* (quoting *Johnson*, 977 F.2d at 1367) (internal quotation marks omitted). Specifically, the district court heard testimony from multiple officers regarding the collection of the plastic ties and the status of the ties prior to collection. This testimony established that the plastic ties remained undisturbed on the floor until they were collected by Officers Nash and Burris. Moreover, as noted by the district court, there "was no evidence suggesting any likely contamination, such that defendant's DNA was somehow placed on the tie or another person's DNA was removed." R., Vol. 1, at 135 (Mem. & Order, dated Aug. 26, 2011).

-15-

Accordingly, the district court did not abuse its discretion by admitting evidence concerning the DNA on the plastic ties and by holding that any deficiencies in the chain of custody went to the weight of the evidence, not its admissibility. *See Yeley-Davis*, 632 F.3d at 683.

**B**

We turn next to Mr. Brooks's argument that the district court erred by admitting the testimony of the government's expert witness, Ms. Stone. Mr. Brooks contends that Ms. Stone's testimony should have been excluded because "the testing actually performed by Ms. Stone (the swabbing of just the ends of the zip ties) was materially different than the testing reported (a 'general swab'), and provided to the defense in advance of trial." Aplt. Opening Br. at 46. According to Mr. Brooks, the "inaccura[cy]" in Ms. Stone's report, and the fact that he did not learn of it until trial, "prevented [him] from marshalling [sic] the necessary resources to adequately challenge Ms. Stone's methodology, or conduct his own testing on the zip ties."[7] *Id.*

_____

[7] Mr. Brooks also argues that "[t]his case can . . . be likened to *Brady v. Maryland*." Aplt. Opening Br. at 48. While Mr. Brooks alluded to this argument in his original motion to strike, we question whether he fleshed it out sufficiently to preserve a distinct constitutional claim akin to *Brady* for appellate review. In his original motion to strike, Mr. Brooks argued that "the misleading and/or false pretrial disclosures by the Government's witness have constitutional implications of the type considered by the United States Supreme Court in *Brady v. Maryland*, 373 U.S. 83 (1963), *Kyles v. Whitley*, 513 U.S. 419 (1995), and their progeny." *United States v. Brooks*, Dist. Ct. No. 2:10-cr-20078-JWL-1, Doc. 76,

(continued...)

[7](...continued)

at 7 (Mot. to Strike, filed March 7, 2011).  Mr. Brooks, however, did not offer any discussion of the specific elements of a *Brady* violation, nor did he explain how the government's actions produced a constitutional violation of the same or similar sort as a *Brady* violation.  However, even if Mr. Brooks did enough to preserve such a claim for appellate review, it would fail on its merits.  Mr. Brooks has not demonstrated on appeal that he could satisfy any of the three elements of a *Brady* claim.  *See generally Hooks v. Workman*, 689 F.3d 1148, 1179 (10th Cir. 2012) ("To establish a *Brady* violation, a defendant must demonstrate that (1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material to the defense." (quoting *United States v. Wooten*, 377 F.3d 1134, 1142 (10th Cir. 2004)) (internal quotation marks omitted)); *cf. id.* ("This [*Brady*] test is conjunctive, and failure to satisfy any of the prongs is dispositive.").  First, while Mr. Brooks did establish at trial that the language that Ms. Stone used in her report could engender some confusion, he has not demonstrated that such confusion amounted to an actual failure to disclose before trial—that is, a suppression of—the information concerning the nature of the testing that Ms. Stone performed.  Even if Mr. Brooks could establish as much, it is undisputed that he did learn the true circumstances regarding the testing *at trial*, when he was able to contemporaneously employ the information in his defense.  Moreover, if he believed that it was necessary to effectively address the matter, he could have—but did not—seek a continuance.  Under *Brady*'s framework, when evidence is made available at trial—at least under circumstances such as these—there is no basis to assert that the government has suppressed it.  *See United States v. Smith*, 534 F.3d 1211, 1223 (10th Cir. 2008) ("The *Brady* rule is not violated when the material requested is made available during trial." (quoting *United States v. Rogers*, 960 F.2d 1501, 1510 (10th Cir. 1992)) (internal quotation marks omitted)); *cf. United States v. Young*, 45 F.3d 1405, 1408 n.2 (10th Cir. 1995) (noting that our court has "stated on several occasions that *Brady* is not violated when the material requested is made available during trial" but "[d]espite our seemingly unequivocal statements on this question, we have generally proceeded to examine whether the circumstances of disclosure during a trial were such as to prejudice the defense").  Second, Mr. Brooks has not demonstrated that the specifics of Ms. Stone's testing (or, in this case, lack of testing) were *favorable* to the accused; he has only alleged that, if he had not been confused by the report's language regarding the nature of Ms. Stone's testing, he *could* have tested the zip ties himself and such testing *could* have revealed *potentially* exonerating evidence.  That is not good enough.  *See*

(continued...)

-17-

As noted above, "we review a district court's decision to admit evidence for an abuse of discretion, and we reverse a decision only if it is 'manifestly erroneous.'" *Irving*, 665 F.3d at 1210 (quoting *McPhilomy*, 270 F.3d at 1312) (internal quotation marks omitted). In support of his contention that Ms. Stone's testimony should have been excluded because the testing that she reported and the testimony that she gave at trial were "materially different," Mr. Brooks relies on the Second Circuit's decision in *United States v. Kelly*, 420 F.2d 26 (2d Cir. 1969). *See* Aplt. Opening Br. at 46–47. In *Kelly*, the Second Circuit found "error in permitting the use [at] trial of the results of scientific tests made for such use when timely disclosure of the tests had not been made." 420 F.2d at 27. Not only is *Kelly* not binding precedent in our circuit, it is easily distinguishable from Mr.

[7](...continued)
*United States v. Erickson*, 561 F.3d 1150, 1163 (10th Cir. 2009) ("A *Brady* claim fails if the existence of favorable evidence is merely suspected. That the evidence exists must be established by the defendant."); *see also United States v. Caro*, 597 F.3d 608, 619 (4th Cir. 2010) ("Because [the defendant] can only speculate as to what the requested information might reveal, he cannot satisfy *Brady*'s requirement of showing that the requested evidence would be 'favorable to [the] accused.'" (second alteration in original) (quoting *Brady*, 373 U.S. at 87)). Furthermore, because Mr. Brooks cannot establish that any suppressed evidence was favorable to his defense, it follows ineluctably that he cannot demonstrate the third element of *Brady*—*viz.*, materiality, in that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Knighton v. Mullin*, 293 F.3d 1165, 1172 (10th Cir. 2002); *see, e.g.*, *United States v. Headman*, 594 F.3d 1179, 1184 (10th Cir. 2010).

-18-

Brooks's case; in fact, the wrongfulness of the government's conduct in *Kelly* provides a useful contrast with the government's conduct here.

In *Kelly*, the government opposed the defendants' discovery request, arguing that it was a fishing expedition. *See id.* at 27–28. The district court denied the broad request "but did permit inspection of the chemical analysis of the drugs in the indictment." *Id.* at 28. The government then sent the drugs for testing, including for the chemical analysis that they presented at trial, but "did not inform the defendants of this test." *Id.* In contrast, here, at the government's behest, Ms. Stone shared all of her reports and analysis with Ms. Beine.[8] Furthermore, we would be hard-pressed to find that the mere semantic difference between Ms. Stone's report and her testimony was material or constituted a discovery violation. And, even assuming *arguendo* that the purported discrepancy did effect a discovery violation, Mr. Brooks has failed to present any evidence of bad faith on the part of the government or any evidence of prejudice such that a sanction would have been warranted. *Cf. United States v. Brown*, 592 F.3d 1088, 1090 (10th Cir. 2009) (listing the three factors to be considered by the district court when determining if a sanction is proper; the first involves the reason for

---

[8]     During discovery, Ms. Stone provided Mr. Brooks's DNA expert, Ms. Beine, with copies of her lab's "standard operating procedures, and all electronic and case documentation for [Mr. Brooks's] case." R., Vol. 2, at 297. Ms. Beine only "asked for [Ms. Stone's] case file and the electronic data," she did not "ask for access to do any testing of her own." *Id.* at 332.

the government's delay and the second and third involve considering the alleged prejudice).

Notably, Mr. Brooks does not allege that "he *would have* had his expert conduct additional testing" on the zip ties, Aplee. Br. at 48; and Ms. Beine did *not* testify at trial that "she would have done anything differently if she had more accurately understood what Ms. Stone meant by the use of the term 'general swab,'" *id.* (citation omitted). Additionally, Ms. Beine testified that she did not "feel [Ms. Stone] was trying to hide anything from [her]," R. Vol. 2, at 587, and that she "didn't feel that the handling of the zip ties was really in question," *id.* at 588. As the government cogently assesses the matter:

> we are left with a situation where [Mr. Brooks] claims he was prejudiced, but he did not seek to cure the prejudice when he should have. He made a strategic decision not to request a continuance so he could conduct further testing, choosing instead to take the opportunity to argue to the jury that the government's expert botched the analysis.

Aplee. Br. at 48–49.

"The mere fact that the defendant was surprised by the evidence does not mandate that the evidence be excluded." *United States v. Edmonson*, 962 F.2d 1535, 1546 (10th Cir. 1992) (alteration omitted) (quoting *United States v. Atisha*, 804 F.2d 920, 925 (6th Cir. 1986)) (internal quotation marks omitted). As we have previously explained, "It would be a rare case where, absent bad faith, a district court should exclude evidence rather than continue the proceedings."

*United States v. Golyansky*, 291 F.3d 1245, 1249 (10th Cir. 2002). Here, there is no evidence of bad faith, and as noted above, there is limited, if any, evidence that Mr. Brooks was prejudiced by the alleged discrepancy between Ms. Stone's testimony and her expert report. Accordingly, the district court's denial of Mr. Brooks's motion to strike was not an abuse of discretion.

## C

Mr. Brooks's third challenge to the evidentiary rulings of the district court concerns the admission of evidence showing that Mr. Brooks was in possession of large amounts of cash several months following the robbery. Mr. Brooks challenges the admission of this evidence on the grounds that "the amount of money and the temporal distance from the Security Bank robbery render the evidence irrelevant and prejudicial." Aplt. Opening Br. at 50. More specifically, Mr. Brooks argues, "While there are cases in which the Government has been permitted to present testimony regarding a bank robbery suspect having possession of a large amount of cash, the courts have limited that testimony to those witnesses who can identify the date upon which the observation was made as being *very close in time following the robbery*." *Id.* at 51–52 (emphasis added).

We conclude that, on these facts, the district court did not err in admitting the evidence of Mr. Brooks's possession of large amounts of money—and, notably, large amounts of cash. The "possession of a large sum of cash at about

the time of an offense may be considered as part of the circumstantial evidence where warranted by the particular facts involved." *United States v. Brewer*, 427 F.2d 409, 411 (10th Cir. 1970); *see United States v. Marx*, 485 F.2d 1179, 1182–84 (10th Cir. 1973) (upholding admission of evidence that a bank robber possessed $3,000 in cash six weeks after a bank robbery netted $49,500 and noting that "[f]or [the evidence] to be admitted, all that is required is that it have enough rational connection with the issues to be considered a factor contributing to the deciding of the issues"); *see also United States v. Weller*, 238 F.3d 1215, 1221 (10th Cir. 2001) (finding that "evidence of [the defendant's] sudden change in circumstances was [properly] offered as circumstantial evidence of guilt"); *United States v. Crisp*, 435 F.2d 354, 360 (7th Cir. 1970) ("It is well settled that the sudden, unexplained acquisition of wealth is competent evidence supporting proof of guilt in larceny or crimes involving a motive of enrichment. Proof of possession of substantial sums of money after the date of an offense may be admissible circumstantial evidence where warranted by the particular facts of the case."). However, "the probative value of such proof may be outweighed by the possibility of confusing and prejudicing the jury." *Brewer*, 427 F.2d at 411.

It is axiomatic that the probative value of evidence must be assessed in the factual context of a given case. *See, e.g.*, *id.* (focusing on "the particular facts involved"). On these facts, the evidence was strongly probative on the issue of Mr. Brooks's commission of the robbery and, importantly, its probative value was

-22-

not significantly diminished by the timing of the observations of his possession of the cash; in other words, the evidence was not too remote. *See id.* at 412 (noting that we could not say that "the trial court abused its discretion in determining that such circumstantial evidence was relevant and probative, and *not remote* and prejudicial, under all the circumstances" (emphasis added)).

There was evidence before the jury here that Mr. Brooks was impoverished before the robbery—notably, drawing unemployment from April 2006 until November 2006, a month before the robbery—and that he had no reported income for approximately one year following the robbery. As the district court noted, "[t]he challenged testimony was especially probative in this case, as the Government presented evidence that defendant did not have any significant income during this period." R., Vol. 1, at 133. Indeed, comparatively speaking, Mr. Brooks's extended period of penury provides the foundation for a very stout argument, based upon his changed circumstances, for admission of the evidence because, even absent such a poverty showing, we have admitted cash-possession evidence. *Compare Weller*, 238 F.3d at 1221 ("[T]he Government introduced evidence that [the defendant] possessed a large amount of cash after the robbery, where before the robbery she had an empty bank account, 'maxed out' credit cards, and no other obvious source from which to obtain cash. It appears this evidence of her sudden change in circumstances was offered as circumstantial evidence of guilt and went well beyond the improper use of 'poverty as

-23-

motive.'"), *with Brewer*, 427 F.2d at 412 ("Nor do we think that the absence of proof of prior poverty destroyed the relevance of proof of the [defendant's] cash purchase here in view of the circumstances recited surrounding the transaction and the other incriminating evidence."). Upon hearing that Mr. Brooks was in possession of large amounts of cash subsequent to, but around the time of, the robbery, a reasonable jury—after considering the totality of the evidence, including the evidence regarding his penury—could infer that Mr. Brooks cured his financial woes by committing the robbery. Therefore, on these facts, the cash-possession evidence was strongly probative.

The timing of the observations of Mr. Brooks's possession of large amounts of cash does not significantly diminish the strong, probative value of this evidence. Given the considerable amount of cash that was stolen from the Security Bank it would have been reasonable for a factfinder to conclude that the robber would still be in possession of some of the stolen cash several months following the robbery. As noted by the district court, the fact "that the proceeds of the bank robbery were some $200,000 . . . engenders a longer period of time for which one might expect the residual cash to remain, which, of course, is the inference to be made here." R., Vol. 2, at 338.

It is true that, in some of our cases where we have upheld the admission of evidence related to the defendant's possession of cash, the time lapse between the robbery and the possession has been shorter than that present here. *See Marx*, 485

F.2d at 1182–84; *Brewer*, 427 F.2d at 411–12. However, those cases do not purport to establish a requirement that the defendant's cash possession be observed "very close in time following the robbery." Aplt. Opening Br. at 52. Mr. Brooks's citation to *Brewer* for such a proposition is misguided. Indeed, in *Brewer*, we did not even insist that the evidence show that the defendant possessed the cash *following the robbery*, just so long as the possession was "at about the time" of the robbery. 427 F.2d at 411 ("[W]e do not feel that the fixing of the exact date of the car purchase [by the defendant] as occurring after the robbery was essential here . . . ."). Rather, in assessing the admissibility of the cash-possession evidence in *Brewer*, we focused on "the particular facts involved." *Id.* Following that approach here, we are cognizant of the large amount of money obtained in the robbery (i.e., over $240,000) and conclude that it would have been reasonable for a jury to infer that it would have taken a robber at least several months to spend it. Consequently, the somewhat longer time lapse here does not significantly diminish the strong, probative value of the cash-possession evidence.

Although Mr. Brooks discusses the hypothetical possibility that such evidence may result in prejudice, he offers little in the way of argument regarding how admission of the cash-possession evidence in this case unfairly prejudiced him. In addition to the purported "temporal distance" concern, which we have demonstrated would not have "render[ed] the evidence irrelevant and [thus]

-25-

prejudicial," Aplt. Opening Br. at 50, Mr. Brooks suggests that he was prejudiced because the jury was not informed of the precise amount of cash in his possession, *id.* at 52 (noting "[t]he problem with admitting testimony regarding undetermined amounts of money").  However, Mr. Brooks cites no authority that would require the government to establish the precise amount of money possessed by a defendant—as long as it is a comparatively large amount—and we are not aware of any such authority.  Lastly, in perhaps an allusion to the possibility of juror confusion, Mr. Brooks states that he "had other [presumably legitimate] sources of income," *id.* at 50, but nothing in the record validates that assertion.  In sum, we cannot say that, in light of the relevant circumstances, the district court abused its discretion in admitting the cash-possession evidence.  Moreover, even if we were to conclude that the district court erred in admitting the evidence, as the government has correctly suggested, *see* Aplee. Br. at 52, the error would be harmless in light of the other evidence against Mr. Brooks, which we discuss in greater detail in the following section, Part II.D.  That evidence "was, frankly, pretty compelling."  *United States. v. Esquivel-Rios*, --- F.3d ----, 2013 WL 3958372, at *8 (10th Cir. 2013); *see United States v. Burgess*, 576 F.3d 1078, 1100–01 (10th Cir. 2009) (concluding that the error was harmless where evidence would not have had a substantial influence on the jury's decisions).

**D**

We turn now to Mr. Brooks's contention that "insufficient evidence was

produced at trial to support his conviction for armed bank robbery in violation of 18 U.S.C. § 2113(a) and (d)." Aplt. Opening Br. at 28. Mr. Brooks relies on three facts in support of his argument:

> (1) the video surveillance of the masked man who robbed the Security Bank was grainy at best; (2) neither teller could conclusively identify Mr. Brooks as the bank robber; and (3) the DNA linking Mr. Brooks to *one* zip tie from the scene of the crime, which had a questionable chain of custody to begin with, was easily explained by Mr. Brooks' intimate relationship with Ms. Gilbert—the bank teller.

*Id.* at 28–29. Based on the above, Mr. Brooks argues that there was insufficient evidence to support his conviction "because the Government presented no more than circumstantial inferences to prove that he was, indeed, present at the scene of the robbery." *Id.* at 32.

"We review de novo the sufficiency of the evidence upon which [a defendant] was convicted, asking only whether taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *United States v. Bader*, 678 F.3d 858, 873 (10th Cir. 2012) (alteration omitted) (quoting *United States v. McCane*, 573 F.3d 1037, 1046 (10th Cir. 2009)) (internal quotation marks omitted). "Rather than examining the evidence in bits and pieces, we evaluate the sufficiency of the evidence by considering the collective inferences to be drawn from the evidence as a whole." *Id.* (alteration omitted) (quoting *United States v.*

*Wilson*, 107 F.3d 774, 778 (10th Cir. 1997)) (internal quotation marks omitted). "[A]n inference is only reasonable where there exists a probability that the conclusion flows from the proven facts." *United States v. Rahseparian*, 231 F.3d 1257, 1262 (10th Cir. 2000) (quoting *United States v. Jones*, 44 F.3d 860, 865 (10th Cir. 1995)) (internal quotation marks omitted). "[W]e may not assess the credibility of witnesses or weigh conflicting evidence, as these tasks are exclusively for the jury." *Bader*, 678 F.3d at 873 (quoting *United States v. Bowen*, 527 F.3d 1065, 1076 (10th Cir. 2008)) (internal quotation marks omitted).

Mr. Brooks argues that the evidence presented by the government was "insufficient . . . to support a conviction for armed robbery" because "presence is an obvious element of the crime, necessary for conviction," and the government "failed to establish his presence beyond a reasonable doubt." Aplt. Opening Br. at 39. Mr. Brooks's arguments are unpersuasive.

There was significant evidence supporting the jury's finding that Mr. Brooks committed the bank robbery. Notably, a reasonable jury could have inferred from the evidence that the robber had some prior relationship with Ms. Gilbert and knowledge of the bank's procedures and security protocols; and logically also could have inferred—after considering the totality of the evidence—that, based upon Mr. Brooks's romantic relationship with Ms. Gilbert at the time of the robbery and frequent telephone communications with her prior to the robbery, that Mr. Brooks was the robber (that is, the masked man present in

-28-

the bank) and that Ms. Gilbert—whether unwittingly or not—provided Mr. Brooks with information about the bank's operations.[9]

More specifically, there was testimony that indicated that the robber waited until after Ms. Gilbert had time to disable the alarm before he forced his way in; that the robber treated the two bank tellers differently—arguably, treating Ms. Gilbert more favorably—in that he only asked for Ms. Sherrod's keys, and further, in this regard, when the officer cut the ties off of the women's hands, he found that those on Ms. Gilbert were not as tight as the ones on Ms. Sherrod; that Ms. Gilbert was unable to open the first safe that had a comparatively small amount of cash but had no trouble opening the second safe that contained a much greater amount of money; and that Ms. Gilbert was unusually calm after the robbery. Moreover, phone records introduced at trial showed that Mr. Brooks and

---

[9] In the indictment, the government did not charge Ms. Gilbert with aiding in the commission of the bank robbery or any other crime related to the robbery, or otherwise identify her as an uncharged accomplice of Mr. Brooks. Indeed, even in post-trial sentencing proceedings, the government spoke very gingerly and vaguely about the nature of Ms. Gilbert's involvement in the robbery. *See* R., Vol. 2, at 816 (Sentencing Tr., dated Oct. 19, 2011) ("But whether that victim, Ms. Gilbert, knew it was her boyfriend or not – and I don't believe we have ever said anything at trial or in anything we filed here exactly what we believed her role to be. Whether she is – certainly she was not an uncharged codefendant. Whether she was an uncharged coconspirator is another issue. Whether she planned all this in advance or whether she merely talked about the possibility, . . . I don't think we have ever taken a position in this courtroom on which it is."). Mr. Brooks's counsel was not so restrained, noting that Ms. Gilbert "was not treated as a victim in this case but rather an uncharged codefendant." *Id.* at 811.

Ms. Gilbert were in almost constant cell phone contact for a period of time before the robbery and then resumed such contact approximately three months after the robbery; phone records also showed that Mr. Brooks was on the phone until just prior to the robbery. Furthermore, there was testimony that the robber was a black man, like Mr. Brooks; and there was also testimony indicating that there were no physical inconsistencies between the robber and Mr. Brooks. Going further, there was evidence introduced that Mr. Brooks had only a meager income for at least a year prior to the robbery and was without reported income from approximately a one-month period before the robbery until approximately one year after it, while two different witnesses in the months after the robbery observed Mr. Brooks in possession of large amounts of cash.

And, if all of that was not enough, there was unassailable evidence that Mr. Brooks's DNA was on one of the zip ties collected from the robbery. This evidence strongly indicates that Mr. Brooks was present in the bank at the time of the robbery—in other words, under these circumstances, that he *was* the robber. With respect to the DNA evidence, Mr. Brooks is correct that "it was absolutely uncontroverted that it was *possible* that Brooks's DNA got on the zip tie by means of something other than direct touch." Aplt. Opening Br. at 34. However, the *possibility* that Mr. Brooks's DNA could have ended up on the zip tie by means of something other than direct touch hardly avails Mr. Brooks unless no reasonable jury could still have convicted him—when looking at the totality of

-30-

the evidence—because of this possibility. We conclude that, even in light of this possibility, that a reasonable jury could have convicted Mr. Brooks with little difficulty based on the evidence before it. Not insignificantly, that evidence included testimony of the government's DNA expert, Ms. Stone, who responded to the government's query about the possibility of a secondary transfer to the tie—*viz.*, "a person's DNA may have been on one of the victim tellers and then from that victim teller [is] transferred to the tie"—that the scenario was "very highly unlikely." R., Vol. 2, at 298. As the district court appropriately explained, "the evidence supporting the conviction need not conclusively exclude every other reasonable hypothesis or negate all possibilities except guilt." *Id.*, Vol. 1, at 130.

In sum, we conclude that there is ample record evidence from which a reasonable jury could have found, beyond a reasonable doubt, that Mr. Brooks committed the bank robbery charged in the indictment.

**E**

Mr. Brooks's final argument is that the district court erred in denying him a new trial based on alleged juror misconduct. We "review for abuse of discretion the district court's decision to hold a hearing and its determination whether any jury taint requires a new trial." *United States v. Scull*, 321 F.3d 1270, 1280 (10th Cir. 2003); *accord United States v. Davis*, 60 F.3d 1479, 1482 (10th Cir. 1995) ("We review the denial of a motion for a new trial based upon juror misconduct

-31-

for an abuse of discretion." (quoting *United States v. Simpson*, 950 F.2d 1519, 1521 (10th Cir. 1991)) (internal quotation marks omitted)). "The question of [a juror's] honesty during voir dire and in [his] testimony before the [district court] is a factual determination we review only for clear error." *Gonzales v. Thomas*, 99 F.3d 978, 985 (10th Cir. 1996).

"It is a well-settled principle that a litigant is entitled to a fair trial, albeit not a perfect one." *Skaggs v. Otis Elevator Co.*, 164 F.3d 511, 515 (10th Cir. 1998). "An impartial jury is an essential element of a litigant's right to a fair trial." *Id.* "[V]oir dire is intended to expose possible juror biases and is employed to insure that jurors are impartial." *Id.* The Supreme Court, in *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984), "articulated a two-prong test to be applied to determine whether a litigant is entitled to a new trial in the face of allegations that a juror's voir dire responses were untruthful." *Skaggs*, 164 F.3d at 515. Under the *McDonough* test:

> [T]o obtain a new trial . . . , a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

*McDonough*, 464 U.S. at 556. Importantly, "[t]he *McDonough* test is directed at intentionally incorrect responses." *United States v. McConnel*, 464 F.3d 1152, 1157–58 (10th Cir. 2006) (quoting *Gonzales*, 99 F.3d at 984) (internal quotation

marks omitted). Thus, the *McDonough* test is not satisfied where a "juror's answer (or non-answer), although mistaken, was not dishonest."[10]  *Id.* at 1157.

Mr. Brooks argues that Mr. Clark, the jury foreperson, lied "by omission" in failing to inform the court and the parties during voir dire that he "was under investigation by the very same federal agency that was prosecuting Mr. Brooks." Aplt. Opening Br. at 56.[11]  Specifically, Mr. Brooks claims that Mr. Clark was untruthful during voir dire because he failed to respond when

> jurors were asked whether any of them: (1) were "acquainted with" law enforcement[]; (2) had knowledge gained by "some involvement" with law enforcement; (3) had "been involved in the criminal justice system before[]"; or (4) knew of any other reason that would make it difficult to sit "as an impartial juror on

---

[10]      "We have noted that the *McDonough* framework is not the exclusive means for showing that a party has been denied a fair trial because of the participation of a biased juror."  *McConnel*, 464 F.3d at 1158.  "But because [Mr. Brooks] has not attempted to show any circumstances other than the allegedly dishonest *voir dire* answers and relies solely on *McDonough*, we need not go further in our analysis here."  *Id.*

[11]      At the post-trial hearing regarding Mr. Brook's motion for a new trial, Mr. Clark testified that he had been involved with the IRS for four or five years on a collections matter relating to a payroll tax issue.  In relation to this issue, he had been interviewed by two FBI agents approximately three years prior to Mr. Brooks's trial.  His next involvement with the IRS occurred in April 2010 when criminal investigators from the IRS confiscated records from his home.  At this time, he retained an attorney for a sixty-day period.  That attorney advised him that these types of investigations can take years and "sometimes it ends up with nothing."  R., Vol. 2, at 772 (Hr'g Tr., dated Sept. 30, 2011).  Mr. Clark testified that after sixty days passed he "just continued on" and that his attorney "was no longer involved."  *Id.*  After the completion of Mr. Brooks's trial, Mr. Clark heard that one of his friends had received a subpoena to testify about him to a grand jury.  At that time, Mr. Clark retained a new criminal defense attorney and began dealing directly with the U.S. Attorney's office.

this case."

*Id.* at 55 (citations omitted).

The district court held an evidentiary hearing during which the parties, as well as the district court, questioned Mr. Clark regarding his voir dire answers. At the evidentiary hearing, Mr. Clark testified that he did not "intentionally . . . withhold from [the court and the parties] . . . the information about the IRS investigation." R., Vol. 2, at 788. Nor did he "fail to answer those questions because [he] wanted to get on th[e] jury and help the government convict somebody in order to get the benefit perceived by [him] of helping the government by being on th[e] jury." *Id.*

Following the evidentiary hearing, the district court ruled from the bench, denying Mr. Brooks's motion for a new trial based on juror misconduct. *Id.* at 798–806. In denying the motion, the district court explained that while "the second prong of the *McDonough* test would have been met" because it "probably would have entertained a cause challenge . . . because the facts would have been enough to excuse the juror," *id.* at 802, the first prong was not satisfied because "Mr. Clark neither failed to answer honestly a material question nor did he do so intentionally," *id.* at 799.

As noted above, "[t]he question of [a juror's] honesty during voir dire and in [his] testimony before the [district court] is a factual determination we review only for clear error." *Gonzales*, 99 F.3d at 985. Although Mr. Clark could have

volunteered additional information in response to the questions posed during voir dire, this is not the test for determining whether a juror can be fair and impartial. Rather, under the first prong of *McDonough*, the relevant question is whether Mr. Clark "failed to answer honestly a material question on voir dire." *Skaggs*, 164 F.3d at 515 (quoting *McDonough*, 464 U.S. at 556) (internal quotation marks omitted). Here, Mr. Clark testified at the evidentiary hearing that his answers "were the truth as far as [he] was concerned," R., Vol. 2, at 784, and the district court credited his testimony, *id.* at 800. This was not clear error. Nor was the court's finding that there was no bias on the part of Mr. Clark. In sum, we conclude that the district court did not abuse its discretion in denying Mr. Brooks's motion for a new trial.

## III

For the foregoing reasons, we **affirm** the judgment of the district court and Mr. Brooks's conviction.